

# UNITED STATES DISTRICT COURT
## FOR THE STATE OF NEBRASKA, LINCOLN DIVISION

HOLLIE TELFORD and STEVEN FRITTS
  Plaintiff

:

Civil No. 4:16 CV3147

v.

:

UNITED STATES OF AMERICA;
MOUNTAIN WEST FARM BUREAU
INSURANCE COMPANY, GEORGE
POWERS; LAW OFFICE OF
SUNDAHL, POWERS, KAPP &
MARTIN, LLC; SUSAN AUKEMA
PAMELA GEE, LEA BONNECAZE
and does 1-10

:

**COMPLAINT**

: **DEMAND FOR JURY TRIAL**

:

Defendants

:

---

COMES NOW PLANTIFFS to allege as follows:

1. Hollie Telford is also H. Lundahl Telford and is representing her own interests and the assigned interests of Marti Teford as shown by the Assignment attached as exhibit "35".

2. Steven Fritts is the chief trustee of the Shanandoah Trust and is now representing assigned interests of the trust which were formerly represented by Lisa Nelson. Dunmore v. Dunmore, 2012 Cal. App. Unpub. LEXIS 747 (Cal. App. 3d Dist. 2012) (Chief Trustee of Trust can assign trust claims to himself as a function of his office.)

3. Plaintiff HOLLEI is declared as permanently disabled by the SSA through their own medical experts – bearing a diagnosis of diastolic congestive heart failure. Attached hereto as exhibit "1" is the latest report by the Government's own cardiologist taken in 2009 confirming this permanent disability diagnosis, and as was also done in a state proceeding in Utah in 1999 by the Honorable Fred Howard, case no. 990402368. The Supreme Court in Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) concluded that persons declared as disabled by the SSA establish their disability status within the meaning

1

of 42 U.S.C. 12102. Any person establishing their disability status under the ADA, also establishes their disability status under the FHA. Nationwide, 52 F.3d at 1360.

4. Marti Lundahl, the assignor of RICO and other claims to Plaintiff Hollie Telford, is also a declared disabled person by the SSA, having a diagnosis of invasive carcinoma. See exhibit "2" attached. Furthermore under 42 USC 3617, Hollie has standing in her own right to sue the defendants for retaliatory conduct taken against HOLLIE for protecting the housing rights of Marti and Marti's nuclear offspring.

5. Shanandoah Trust is an organization protecting the rights of it's disabled beneficiaries to include Hollie Telford and Marti Lundahl. Shanandoah Trust originally created in the state of Utah in 1991 as an investment entity as shown in exhibit "3" attached, was converted to a trust in 1996 and it's administration was transferred to the state of Nebraska. This trust's address is 229 N. Pine Street, Gordon NE 69343. Shanadoah Trust was injured when MWFBI unilaterally withdrew a homeowners insurance policy on a dwelling located in Star Valley Ranch Wyoming because the residents of the dwelling then owned by Shanandoah Trust, were disabled. See Wai v. Allstate Insurance Co, 75 F. Supp. 2d 1 (D.D.C. 1999) (refusal to provide homeowners insurance to a dwelling because the residents are handicapped is unlawful and the owner has standing to sue the insurance company for that refusal.).

6. Shanandoah Trust, Plaintiff HOLLIE and assignor Marti had an equity interest in the Wyoming dwelling located at 322 Vista East, Star Valley Ranch, WY and brought suit in 2013 to quiet title in that residential equity interest. That quiet title case was settled in Plaintiff's favor and Plaintiff's executed a notarized dismissal with prejudice stipulation bearing that resolution. See exhibit "4" attached. As petitioned in the quiet title case, title in the home was conveyed to Lisa Nelson as a co-trustee to the Shanandoah Trust. See exhibit "9" attached for property Index showing this titling transaction.

7. Steve Fritts as the chief trustee of the Shanandoah Trust and now assignee of the claims of the trust, therefore has standing to sue the Defendants herein for cancellation of an insurance policy protecting the subject dwelling because the residents HOLLIE and Marti were disabled and for the loss in equity in the home sustained by the trust based on the defendant's bad faith conduct. See also *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) ([defendant's] . . . practices have perceptibly impaired the organization's ability to protect the housing rights of low to moderate-income homeseekers; therefore there

2

can be no question that the organization has suffered an injury in fact and is entitled to sue the defendants.)

8.    In 2014, Plaintiffs HOLLIE and STEVE complained to HUD employees Kinara Flagg and Eva Tafoya regarding the discriminatory housing practices of MWFBI and her respective employees. Flagg and Tafoya had an affirmative duty to investigate in Plaintiff's fair housing claims against MWFBI under both federal and state laws. Specifically, Wyoming's Fair Housing Act provides the exact same duties as the Federal Fair Housing Act and does not discriminate as to the actor. The relevant rules are:

> (1)  Wyo stat. 40-26-107  provides:
> (a)  A person may not discriminate in the sale or rental of, **or make unavailable or deny, a dwelling to any buyer or renter because of a disability of:** (i) That individual; (ii) **An individual residing in** or intending to reside in **that dwelling after it is sold, rented, or made available;** or (iii) **Any individual associated with the buyer or renter.**
> (b)  A person may not discriminate against an individual in the terms, conditions or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability of: (i) That individual; (ii) An individual residing in or intending to reside in that dwelling after it is sold, rented, or made available; or (iii) Any individual associated with the buyer or renter.
> (2)  Wyo stat. 40-26-120. Investigation.
> (a)  **If the federal government has referred a   complaint to the enforcing authority or has deferred jurisdiction over the subject matter of the complaint to   the enforcing authority,** the enforcing authority shall   investigate the allegations set forth in the complaint . . .within 100 days.
> (3)  Wyo stat. 40-26-144. Intimidation or interference; penalty
> (a)  A person commits an offense if the person,   without regard to whether the person is acting under color  of law,  by force,  threat, intentional intimidation or interference. . .prevents a person from exercising their rights under this act.
> HUD's federal executive departments,  agencies and employees **are mandated under  42 U.S.C. § 3608(d) to  administer their programs and activities relating to housing and urban development in a manner affirmatively to further fair housing.**

Here, the HUD employees not only failed to advance the affirmative directives of the fair housing act,  they also failed to refer our complaint to any enforcing authority in Wyoming, thus taking liability upon themselves for any torts related thereto. See United States v. Muniz, 374 U.S. 150, 164–65 (1963) (failure to comply with statutory duties permits suit in federal district court under the FTCA under negligence theory.);    *Griffin v. United States*, 500 F.2d 1059, 1069 (3d Cir.1974)  (the government may be liable where its employees, in carrying out

3

their duties failed to conform to ..." regulations or statute and harm is caused thereby.).

9. In the instant action, HUD employees Flagg and Tafoya, failed to affirmatively advance the objectives of the Wyoming and Federal Fair Housing Acts by prohibiting MWFBI from engaging in discriminatory housing practices with respect to Plaintiff's homeowners insurance on the subject dwelling and hence Interfered with Plaintiff's rights under both acts. In addition, these persons never referred Plaintiff's housing complaints to any Wyoming enforcing authority. Therefore in July of 2014, when HUD officials FLAGG and TAFOYA failed to conduct any investigation against MWFBI within the 100 limit provided under both the state and federal acts, Plaintiffs filed a form 95 FTCA administrative claim against the USA for the negligent acts of Flagg and Tafoya seeking claims for negligent investigation, negligent infliction of emotional distress, tortious interference with quiet enjoyment of our residence and nuisance. That form 95 administrative claim was served upon the USDOC civil torts division on or about January 3, 2016. See exhibits "31' and "32" attached. The USA did not respond to this claim within 6 months; therefore this court has subject matter jurisdiction to hear Plaintiff's FTCA claim as applied to the housing discrimination claims.

10. In May, October and November of 2014, defendant GEE falsely accused HOLLIE of disturbing the peace and criminally trespassing on post office property when HOLLIE appeared at the post office to file a formal complaint regarding intentional interference with Plaintiff's mail directed at Plaintiff's Nebraska trust address and videotaped her appearances. GEE also tortiously barred HOLLIE from ever appearing at GEE's post office, without legal justification. HOLLIE subpoenaed the post office surveillance videotapes as prospective exculpitory evidence of her claims against GEE regarding GEE's multiple false reports that HOLLIE had disturbed the peace or criminally trespassed. Defendant AUKEMA refused to produce this video evidence until HOLLI sued the Postal service. After HOLLIE filed her form 95 administrative claim with AUKEMA directly, AUKEMA destroyed these postal service surveillance videotapes. Plaintiffs subsequently amended their FTCA form 95 claim against the USA (see exhibit "30" attached) to include this spoliation claim and mailed this amended FTCA claim, along with their FTCA claim against the HUD employees to the DOJ civil torts division on January 3, 2016. Refer back to exhibit "32" attached for

4

proof of service. The USA never responded to Plaintiff's amended FTCA claim against the postal service within the six month period. This court therefore has subject matter jurisdiction over this administrative claim.

## SUBJECT MATTER JURISDICTION

11.     This Court has subject matter jurisdiction over the claims herein pursuant to the Federal Torts Claims Act;  the Federal Fair Housing Act;  Section 504 of the Rehabilitation Act,  title III of the ADA,  the Federal Racketeering Act;  Bivens Constitutional Torts for First and Fourth Amendment violations,  EX PARTE YOUNG prospective injunctive  and Declaratory relief; and section 1983 declaratory relief. Plaintiffs also bring state law causes of action for breach of contract;  Breach of the covenant of good faith and fair dealing; negligent infliction of emotional distress, breach of the covenant of quiet enjoyment, and constructive trust.

### PERSONAL JURISDICTION

12.     Plaintiffs reside in Gordon Nebraska where the trust is administered from.  The United States of America is a resident of the state of Nebraska as having offices in this state within the meaning of 1391(c).     Mountain West Farm Bureau Mutual Insurance Company "MWFBI", is an homeowners insurance business incorporated in ALBANY County Wyoming. Defendant Lea Bonnecaze is  MWFBI's employee handling Plaintiff's insurance claims. Jeffrey Donnell is a state judge in Albany County Wyoming  having substantial stock interests in MWFBI.     Defendant DONNELL is only sued under EX PARTE YOUNG for prospective injunctive and declaratory relief.and for declaratory relief under section  1983.     Defendant POWERS and the law offices of SUNDAHL, POWERS, KAPP & MARTIN  aka SUNDAHL  are attorneys and a lawfirm carrying our the illegal acts of their client  MWFBI and  whom depleted the assets of Shanandoah Trust in Nebraska.   Defendants AUKEMA and GEE are postal employees having contacts with Wyoming, Nebraska and Colorado.     Defendant CHRISTINSEN sought to cancel a contract involving Plaintiff HOLLIE when he learned that MWFBI refused to pay for collateral losses to the  Wyoming residence and which act  allowed the issuing  Bank to call  an equipment loan  or otherwise foreclose on Plaintiff's Wyoming property.

### VENUE JURISDICTION

5

13.     Venue lies in this jurisdiction pursuant to 18 USC section 1965; 28 USC 1402(a) where a plaintiff resides and under the Nebraska Trust Code where the assets of the trust are administered pursunat to § 30-2808.

## GENERAL JURISDICTION

14.     On August 9, 2013, Plaintiff HOLLIE approached Mountain West Farm Bureau Insurance for homeowners insurance coverage on residential     property owned by Shanandoah Trust.     At the time of the application, HOLLIE informed MWFBI's agent Lea Bonnecaze, that HOLLI and Marti, heads of households of their family unit, were disabled beneficiaries of the Shanandoah Trust, and that the residence was owned by Shanandoah Trust.     Lea Bonnecaze indicated that she would place the policy in Plaintiff HOLLIE and Marti's names as the occupants of the home and that the policy would also protect Shanandoah Trust as an owner and a covered payee as promised @ pg 3 of 5 of the definition section of the policy attached hereto as exhibit "13".     In line with that agreement, Lea Bonnecaze emailed HOLLIE and Shanandoah Trust an "Evidence of Insurance" on August 13, 2013     (attached hereto as exhibit "5") as proof that the home was covered. Attached hereto as exhibit "6" is Lea Bonnecaze's email confirming that she had sent to Evidence of Insurance to Shanandoah Trust's email account.     Attached hereto as exhibit "7" are photos of the insured Cabin residence taken for the insurance file and emailed to Bonnecaze. The first photo shows the concrete covered 3 story fireplace that kept the home from later sliding downhill.     The second photo is a picture taken from the driveway and showing the golf coarse across the street.

15.     Because Plaintiff residents were disabled persons, HOLLIE made arrange-ments to pay the policy insurance premiums to MWFBI either monthly or every two months.     The monthly payments were to be no more than $43.00 per month.     Attach hereto as exhibit "8" is the declarations page to the subject policy showing the total annual premium under the MWFBI policy as $528.70. Attached hereto as exhibit "10" is the record of negotiated policy payments as of January 7, 2014 totaling $316.41, the last day that MWFBI would accept any further premiums from Plaintiff HOLLIE. (It should be noted that MWFBI in 2013 only accepted payments over the phone or mailed payments since they did not have a website that would negotiate payments online.). By January 7, 2014, the MWFBI policy had been advanced paid through March 9, 2014.

16. In late October and November of 2013, Star Valley Ranch, Wyoming was hit with a huge snow storm. Marti and HOLLIE were away from the home seeking medical care for Marti's crushed legs from a 2006 accident. HOLLIE had a hearing in another quiet title matter in Lincoln county in re Lundahl v. Ruth Telford, no. 2013-14 and returned back to the Wyoming property home to prepare for that hearing, leaving Marti to her extended medical care in Idaho and Marti's children with a relative in Idaho. After being at the house for ½ day, HOLLIE went outside to photograph the depth of the snow reaching the second story balcony so that she could excuse her personal appearance at the Lincoln County hearing on travel safety grounds and instead make a phone appearance. Attached hereto as exhibit "11" is the photograph HOLLIE took of the home and showing this snow nearly burying HOLLIE's truck and up to the second story balcony. The snow storm lasted another two weeks before the occurrence.

17. The roof pitch on the covered residence was at least 12/12. Due to the heat penetrating through the roof from the inside of covered premises home, the snow falling on the roof converted to sheets of ice under the snow. Two weeks later, the weight of the ice and snow on the roof of the 30' x 40' loft home caused four stilts supporting the forward part of our home to sink into the ground and lodge forward. The concrete block fireplace chamber shown as a projection on the east side of the home in exhibit "7" attached (pre-injury), kept the home from projecting further forward and falling onto the ground. The stair well on the west side of the cabin lacked like support and as a result the right side stair accessing the deck, dislodged from the building. When the home abruptly sunk, all of the plumbing and septic/sewage lines suddenly tore apart. The **"efficient proximate cause"** of the losses was the weight of the ice and snow on the roof. [1]

---

1. The **"efficient proximate cause" doctrine,** is utilized in many jurisdictions to settle whether there is insurance coverage when a covered and a noncovered peril contribute to a loss. The doctrine holds that unless the insurance policy provides otherwise, "[i]f a covered peril is found to be the efficient proximate cause, then the loss is covered. Pioneer Chlor Alkali Co. v. National Union Fire Ins., 863 F.Supp. 1226,1230 (D.Nev.1994). Quadrangle Dev. Corp. v. Hartford Ins. Co., 645 A.2d 1074, 1076-77 (D.C.1994) (citing Unkelsbee and describing "proximate cause" in the insurance context as "the efficient cause, the one that necessarily sets the other causes in operation," and as "the dominant cause," distinguishing it from "merely incidental" causes). "The efficient proximate cause doctrine is a default rule which gives way to the language of the contract." Pioneer Chlor Alkali, 863 F.Supp. At 1232.

18. Plaintiff HOLLIE subsequently reviewed the policy to locate the perils covering the losses. Attached hereto as exhibit "14" is peril #12 identifying that the weight of ice, snow or sleet that causes damage to a building is a covered peril for losses to the building/residence but not to the dislodged patio/balcony or stilt foundations. Attached hereto as exhibit "15" is the policy section identifying peril #15 covering sudden or accidental tearing apart of the hot/cold water systems.

19. Plaintiff HOLLIE notified Fritts of the injuries to the home as the chief trustee and subsequently made a written claim on the loss to the water lines and septic lines which were not precluded by peril #12, the weight of ice and water as the efficient proximate cause of the losses. In the interim, HOLLIE proceeded to repair the stilt structures and reconnect the patio at Plaintiff's costs given these loses were excluded under peril # 12. Plaintiffs were in fact required to make such repairs to protect the property from further damage as identified in exhibit "12" attached. HOLLI contacted the town of star valley to confirm her entitlement to repair damaged structures to their original condition under a grandfather clause. Attached hereto as exhibit "16" is that part of the building code for Star Valley Ranch indicating that HOLLIE would not need to obtain a permit to repair the stilts or existing porch-

---

This doctrine is fully enforced in Wyoming, see Miles v. Continental Casualty Co., 386 P.2d 720 (Wyo. 1963) (citing Equitable Life Assur. Soc. of United States v. Gratiot, 45 Wyo. 1, 14 P.2d 438, 82 A.L.R. 1397 (The law will not go further back in the line of causation to find the active, efficient, procuring cause, of which the event under consideration is the natural and probable consequence. The law does not consider the cause of causes beyond seeking the efficient, predominant cause, which following it. . . produced the effect."). Also citing 29A Am.Jur., Insurance, § 1212, p. 351; 84 A.L.R.2d, supra; and 21 Appleman, Insurance Law and Practice, §§ 12483-12484 (1962)), and in Nebraska, see Curtis O. Griess & Sons, Inc. v. Farm Bureau Insurance Co. of Nebraska, 528 N.W.2d 329 (Neb. 1995)(Windstorm was a peril insured against. Infectious diseases were not excluded. Defendant claims the district court erred in the following respects: (1) in granting plaintiff's motion for summary judgment on the issue of liability and overruling defendant's motion for summary judgment. Defendant contends that the immediate, dominant, and proximate cause of plaintiff's loss was pseudorabies and not windstorm. Defendant ends its argument by submitting that since the airborne transmission of an infectious disease is not a covered peril, there is no liability under the policy. Thus, causation is the crux of the parties' dispute. With respect to causation, the parties agree that the pertinent policy language is the phrase "caused directly." "Direct" means immediate or proximate as opposed to remote or incidental. Id.; Clouse v. St. Paul Fire and Marine Ins. Co. 152 Neb. 230, 40 N.W. 2S 820, (1950). When windborne materials occasion a loss, the loss is considered the direct result of a windstorm, because the windstorm is considered the dominant, efficient cause which set the concurring cause in motion. Firemen's Insurance Co. of Newark v. Senseney, 250 F.2d 130, (4th Cir.1957);

8

stair to their original condition in compliance with grandfather clause statute for the state of Wyoming.

20. HOLLIE caused the house to be manually jacked up and additional concrete support extensions to be placed under the 4 stilt posts supporting the forward portion of the home much like the process shown in exhibit "17" attached. However HOLLI learned that the fireplace chase had also sunk into the ground by at least two inches – four inches and since the home was built attached to the fireplace, the home could not be completely leveled even with the repairs HOLLI caused to be made to the 4 supporting forward stilts – without a crane to lift the home. Repairs to the sunken fireplace chase was not an exclusion under the MWFBI policy. Accordingly HOLLI obtained an estimate to lift the home from a crane company in or about Idaho Falls, Idaho at a cost of $15,000.

21. As to the broken water pipes, HOLLIE turned off the water main in the house and instructed the the water company to shut down the town's access line while HOLLIE caused the internal water lines to be repaired at an ultimate cost of $3200. The broken septic lines could not be located or reached from the underside of the home because they were located at the rear of the home which sat directly on the significantly inclined ground which had no crawl space. Reportedly, the back outside of the home would have to be excavated to locate and repair the septic lines at an approximate estimated cost of $12,000. Plaintiffs had an insurance rider to pay for the extra sewer damages. See declarations page at exhibit "8" attached reflecting this rider, plus a policy provision agreeing to pay for clean up of any pollutant sewage at exhibit "18" attached and a policy provision for excavation which expressly provided :

> If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the covered premises necessary to repair the system or appliance.

22. When HOLLIE subsequently turned on the main water lines to the home and likewise instructed the water company to turn on the town's access line, HOLLIE noticed a decrease in water pressure and could hear a break in the main line between the town's access line on Plaintiff's property and the pipes coming into the home from the basement. Accordingly to prevent a diminution of soil and erosion thereby causing further damage to the home, HOLLIE instructed the water company to turn off the town's access line until the

9

main line could be excavated and repaired. HOLLIE obtained an additional quote of $6000 to excavate the property from the access line to the underside of the home to locate the breach in the main line.

23. HOLLIE made initial contact with MWFBI on or about November 29, 2013 to report the loss. HOLLIE contacted MWFBI again on December 3, 2013 to ask for an accommodation from their policy terms found at exhibit "19" attached and which provided MWFBI 45 days to make a payout; instead HOLLIE requested that MWFBI refund HOLLIE immediately for the internal plumbing repairs and any prospective repairs to the main plumbing access line and sewer/lines in order that Plaintiffs not be deprived of their chosen dwelling for lack of competent water and sewer access. "The failure to accommodate is an independent basis for liability under the Fair Housing Act." Wisconsin Community Services v. City of Milwaukee, 465 F.3d 737 (7th Cir. 2006). On December 8, 2013, HOLLIE forwarded her $3200 repair bill for the inside water lines to MWFBI along with a written accommodation letter asking that MWFBI make the foregoing accommodations. This letter is found at exhibit "20" attached. MWFBI told HOLLIE over the phone on the foregoing dates that they would pay for Plaintiff's losses upon receiving bills or estimates for repairs.

24. In the latter part of December and early part of January of 2015, HOLLIE forwarded her repair estimates on the subject real property to MWFBI to include $6,000 to excavate and repair the break in the main water line; $15,000 for a crane to lift the fireplace chase to the home and replace the displaced soil or place extensions thereunder; $20,000 to excavate and repair the sewer lines and sewer tanks; and $8,000 to repair the separated interior walls and reconnect the forward electrical outlets and heating cove devices.

25. On January 7, 2014, HOLLIE made what would be unbeknownst to HOLLIE, the last premium payment that MWFBI would negotiate. Refer back to exhibit "10" attached for HOLLIE's negotiated payment receipts.

26. In the latter part of January of 2014 in a phone conversation with an MWFBI agent, the agent informed HOLLIE that MWFBI had unilaterally increased Plaintiff's insurance premiums mid policy because HOLLI (as a disabled person having two prior back surgeries) could not mount the significantly pitched 12/12 roof during the snow storm and dislodge the ice/show sheets. [2] HOLLI complained that MWFBI's unilateral increase of her premium

---

2. It is doubtful whether even an experienced roofer could have mounted the

violated the FHA and ADA. See Timberline Equipment Co., Inc. v. St. Paul Fire & Marine Ins. Co., 281 Or. 639, 576 P.2d 1244, 1247 (1978) (**Insurer is not permitted to unilaterally modify and change policy coverage.**) Significantly, MWFBI never sent HOLLI written notice of any increase presumably to avoid written evidence of an FHA and title III violation. [3]

27. Plaintiffs never hear back from MWFBI after the January 28, 2014 conversation until they received a letter in the mail on or about February 20, 2014 notifying them that MWFBI had unilaterally canceled their policy for alleged failure to pay policy premiums. See exhibit "21" attached for MWFBI's attorneys admission in the prior Wyoming case that MEFBI claimed to have terminate Plaintiff's policy on the alleged grounds that Plaintiffs failed to make their policy premiums AND NOT ON ANY GROUNDS THAT PLAINTIFFS FAILED TO GIVE NOTICE OF THE LOSSES INCURRED IN NOVEMBER OF 2013. The letter was pretext and false because in fact Plaintiffs premiums had been advanced paid up to the date of March 9, 2014 as shown in exhibit "10" attached.

28. On February 23, 2014, HOLLIE emailed Bonnecaze demanding that Plaintiff's policy be reinstated because Plaintiff's premiums had been prepaid up to the advanced date of March 9, 2014. HOLLIE further demanded that no lapse in coverage occur because of MWFBI's bad faith conduct. Finally, HOLLIE noted that Bonnecaze was ignoring HOLLIE's phone calls. See exhibit "22" attached for this email. In fact, neither Bonnecaze or any other MWFBI employee further contacted HOLLIE or any other covered policyholder regarding the termination of the policy or the claims made thereunder because MWFBI knew Plaintiffs did not have the money to fund a challenge to their demands in legal proceedings. [4]

29. Attempting to charge Plaintiffs higher premiums and then canceling Plaintiff's

---

considerably pitched roof embedded with ice sheets approximating 12 inches thick with another 3 feet of snow on top of that.

3. MWFBI's policy required that any change in increase be in writing. The policy also required that any change in increase be down during the annual renewal periods of the policy.

4. See Jones v. Wells Fargo Home Mortgage, Inc, Adv. Proc. No. 06-1093 (Bankr. E.D. LA 2012)("Wells Fargo has taken advantage of borrowers who rely on it to accurately apply payments and calculate the amounts owed," But perhaps more disturbing is Wells Fargo's refusal to voluntarily correct its errors. **It prefers to rely on the ignorance of borrowers or their inability to fund a challenge to its demands,** rather than voluntarily relinquish gains obtained through improper accounting methods. As a result, the court awards Mr. Jones $3.1 million in punitive damages for Wells Fargo's abusive accounting conduct taken to deprive Mr. Jones of his home.)

insurance because of HOLLIE's disability and inability to scale the 12/12 pitched roof to strike off the ice/snow bound sheets of ice constituted a violation of the FHA and ADA. [5]

30.    From November of 2013 to April of 2014, the latter date when HOLLIE, Marti and Marti's offspring vacated the home to move to a competent housing unit,    HOLLIE shoveled buckets of snow from the outside which she heated on the stove inside the home and used as the water source for the dwelling.    HOLLIE also acquired foldable toliet sources and discharged bags of waste to outside garbage recepticles.    Ultimately, mold and fungi began to accumulate around the broken sewage inlets and floors creating black mold. Moreover sewage fumes permeated the building from the outset requiring Plaintiff's to open windows to air out the building,  to lose heat when airing the building out and consequently causing Plaintiffs heat bill to rise.

31.    At the outset of living in these deplorable conditions, HOLLIE contacted two HUD officials,    Kinara Flagg from HUD's civil rights sector in Washington D.C., and Eva Tafoya from HUD's divisional office in Denver Colorado and filed FHA and ADA complaints. These officials had a duty to investigate into plaintiff's complaints or turn over Plaintiff's complaints over to a enforcing authority in Wyoming to investigate. See Wyo stat.    40-26-120. Investigation.

32.    HOLLIE kept in phone contact with both of these federal officials demanding that they perform their ministerial duties and investigate and prosecute MWFBI for violations of the FHA and ADA. Neither Flagg or Tafoya complied with their statutory duties. First these federal officials neglected to initiate an investigation and contact Plaintiffs with the results of that investigation in writing within 100 days as required under Wyoming's Fair Housing act and federal law. When they failed to refer the action to an enforcing authority in Wyoming, they were required to investigate into Plaintiff's housing and disability claims themselves and issue the required report.    By failing to perform these mandated duties Flagg and Tafoya became liable to Plaintiffs for negligence, emotional distress, breach of quiet enjoyment and nuisance. [6]

---

5.    See VIENS v. America Empire Surplus lines Ins., 3:14-cv-952 (D.CT, 2014) (Defendant's insurance underwriting criteria that charged higher premiums or denied coverage to landlords who rented apartments to tenants receiving Section 8 housing assistance violated the FHA and ADA.)

6.    Nusiance is an obstruction of the free use of property, so as to essentially

33. While HOLLIE was shoveling snow from the outside to the inside of the home and cooking the snow on the stove to provide water access to the home, HOLLIE suffered a herniated disc from her already comprised back. Accordingly, HOLLIE's household was compelled to move from the residence in April of 2014 given MWFBI failed to compensate HOLLIE for the plumbing repairs made to the inside of the home, the repairs made to 2 separated walls on the west side of the home, rewiring some of the electrical outlets that had detached, or providing funds for any of the estimates submitted to: (a) level the home, (b) excavate and repair the main plumbing line, and (c) excavate and repair the sewer system.

34. Before vacating the property which was making the occupants sick, HOLLIE called MWFBI to demand compensation to rent another dwelling under the loss of use provision of the policy. HOLLIE was told that since MWFBI canceled the policy in early February of 2014, that MWFBI would not be funding any relocation expenses. To rent to another dwelling for HOLLIE's household of 5 was $1750 per month. Accordingly, HOLLIE obtained a loan against farm equipment she owned jointly with Dillon Christinsen to fund her relocation and rental expenses. HOLLIE contracted with Defendant D. Christinsen to satisfy the equipment loan (as soon as MWFBI paid HOLLIE benefits under the policy) along with a 25% annual interest return. HOLLIE informed D. Christinsen that she had made a complaint to HUD and that she expected that HUD would be forcing MWFBI to pay Plaintiffs benefits due under the policy. The equipment loan provided that any default thereunder could be additionally collaterized against the Wyoming residence with the consent of Fritts as acting chief trustee. The bank providing the equipment loan was the same credit union HOLLI utilized to pay MWFBI's premiums under the policy.

35. About 10 months had transpired on the equipment loan before D. Christinsen contacted HOLLI expressing his desire to cancel his consent to the equipment loan given HUD had not initiated an investigation against MWFBi for FHA and ADA violations. Christinsen expressed concern that his farm equipment was in jeopardy without the federal

---

interfere with the comfortable enjoyment of life and property. "In order to recover for nuisance, a plaintiff must show substantial interference with the use and enjoyment of his land, Bradley, 635 F. Supp at 1157, or services. Huffman v USA, 95-5234 (6th Cir. 1996) (Nuisance suit viable against postal service). See also Neb. Rev. Stat. § 20-203, which provides that: "Any person... that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy."

13

government backing Plaintiff's claims. Christinsen admitted that he had contacted MWFBI to verify whether MWFBI would be paying the loss of use claims to HOLLIE and MWFBI represented that they would not because MWFBI had canceled the policy before HOLLIE"s household had relocated. Christinsen admitted that he had petitioned the bank to cancel the equipment loan and withdraw his consent for use of his joint collateral for the loan and thus compelled the bank to foreclose on Plaintiff's Wyoming property if Plaintiff's could not otherwise satisfy the loan.

36.    In November of 2014, it was agreed by the chief trustee of the Shanandoah Trust Steven Fritts, co-trustee Lisa Nelson and HOLLIE, that Shanandoah would sell the disabled Wyoming home to HOLLIE at an appraised value rendered by a local bank, and thereafter HOLLIE could obtain a full value equity loan at 4% against the home to satisfy the 25% accruing debt due D. Christinsen and the equipment loan; the proceeds of which were presently subsidizing Plaintiff's relocation and rental expenses MWFBi failed to honor under the policy.

36.    In 2013, MWFBI valued Plaintiff's home at $129,000 for insurance coverage purposes. See exhibit "8" attached. In early December of 2014, Bank of the West (the only local bank) appraised the value of the home in it's present disabled condition to $60,000. As agreed, in the latter part of December 2014, Lisa Nelson as titled trustee for Shenandoah Trust conveyed the disabled home to HOLLIE for Bank of the West's appraised value of $60,000. HOLLIE acquired a carry back unrecorded mortgage with Shanandoah Trust for the purchase price of $60,000. Given Bank of the West appraised the home in it's present disabled condition at $60,000, the Bank would only loan a maximum value on the home of $50,000 @ 3.75% interest only with a pay off of principal in 10 years As soon as HOLLI received these loan funds, HOLLI paid off the equipment loan, paid D. Christinsen his 25% interest to use his share of the collateral on the farm equipment, and used the balance of the loan proceeds to continue funding Plaintiff's displaced rental dwelling fees; a debt covered by the MWFBI insurance policy as noted in exhibit "20" attached. In June of 2015, Bank of the West recorded their lien interest in the Wyoming property as shown in exhibit "9" attached.

37.    Shanandoah Trust was injured by (1) MWFBI's failure to abide by the terms of MWFBI's policy which also construed the Trust as a named insured (see exhibit "13" attached); (2) because MWFBI interfered with the Trust's ability to provide a dwelling to it's

14

disabled beneficiaries in violation of 42 USC 3617 [7]; (3) because the Trust was compelled to convey the disabled property to HOLLIE at an appraised disabled value in order to reduce the financial harm created by MWFBI's failure to honor their loss of use provisions under the MWFBI policy; (4) because the trust was defrauded of an equity value in their home through acts of wire fraud committed by the MWFBI defendants in an amount of no less than $140,000 at the time of conveyance when compared to the value of properties across the street from the trust and as shown in exhibits "26" - "27" attached; and (5) because MWFBI's conduct of ignoring Plaintiff's damage claims to the point where Shanadoah was compelled to convey the trust asset to avoid foreclosure damages, constituted waiver by MWFBI as to Shanandoah's calculated equity loss damages attaching to the home from the covered perils. [8]

38. MWFBI is not only liable to Shanandoah for the "waived" loss value of the residence property, but Plaintiff HOLLIE alleges that MWFBI is also liable to her directly for the loss of use damages attaching to the policy at $25,800 per year; a damage incurred as a direct result of MWFBI's fraud. Speciifically, MWFBI reportedly refused to pay the loss of use damages because MWFBI had already unilaterally canceled Plaintiff's policy under false pretext on February 9, 2014 for HOLLIE's alleged failure to pay premiums and since Plaintiffs did not act on the loss of use provisions until April of 2014, after the policy was canceled, that MWFBI was not liable for this damage. HOLLIE argued by phone with MWFBI that since the loss of use damages directly related to the November 2013 occurrence, it was covered irrespective when HOLLIE and her household decided to put the loss of use damages into

---

7. See **Neudecker v. Boisclair Corp., 351 F.3d 361, 364 (8th Cir. 2003) (finding that plaintiff can base an FHA claim on post-acquisition actions** citing Honce v. Vigil, 1 F.3d 1085, 1089–90 (10th Cir. 1993). **The privilege of inhabiting a home must also include inhabiting the premises free from discrimination under § 3604(b)**. To hold that the FHA does not protect a current tenant from discrimination, or even that the FHA protects a current tenant from discrimination only if the conduct is so egregious that it forces the tenant to vacate a home, is contrary to Congress's goal of creating "'truly integrated and balanced living patterns,'" and would frustrate the purpose of the FHA. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211 (1972). Here, Neudecker was harassed about his disability by other park tenants and management to such a degree that he was ultimately compelled to leave his chosen dwelling. Neudecker thus stated a claim under section 3617.

8. Plaintiffs contend that the moment the home was conveyed to Plaintiff HOLLIE at an appraised loss value of $60,000 by a local bank lender, MWFBI waived their right to calculate the damages attaching to the losses incurred from the November 2013 occurence.

play. HOLLIE also contends that MWFBI waived the right to limit the loss of use damages to one year under the policy because MWFBI fraudulently refused to cover these damages within the limitation period set by the policy. Finally, HOLLIE contends that she is entitled to treble the loss of use damages because the scheme to defraud Plaintiffs of these damages was conveyed by the telephone wires and related back to HOLLIE's emailed demand to reinstate the policy as shown in exhibit "22" attached.

39. As aforesaid stated, HUD employees Flagg and Tafoya never completed the 100 day investigation, consequently on July 21, 2014, HOLLIE emailed Tafoya a form 95 FTCA administrative claim suing the USA for negligent performance of duties and failure to investigate, negligent infliction of emotional distress, tortious interference with quiet enjoyment of our residence and nuisance. [9]   See exhibit "28" attached for this email.

40. In the interim, Defendant GEE was interfering with Plaintiff's mail directed at the Nebraska trust's residence address. When HOLLIE made an appearance at the post office in May of 2014 and complained to a postal superior Pamela Gee with a camera in hand to videotape the complaint, Defendant GEE thereupon called the cops to have HOLLIE falsely detained and arrested for disturbing the peace by using a videotape at the post office without GEE's consent. After the cops showed up and refused to arrest HOLLIE for using a video-camera on public property, GEE made other false allegations against HOLLIE to wit: that HOLLIE was yelling, using profanity and threatening the safety of postal employees when she first walked into the post office. HOLLIE was consequently arrested and taken to the police station for booking. While at the police station, HOLLIE demanded that the officers view the surveillance video camera in the post office lobby to verify GEE's false arrest report. HOLLIE was kept in custody at the police station for another 2 hours while the officers traveled back to the post office to view this surveillance videotape. The tape excultpated HOLLIE from GEE's false charges. HOLLIE was subsequently released and threatened by local officers not to visit the post office again. HOLLIE objected to GEE's interference with her equal protection rights to access the post office under the class of one

---

9.    See United States v. Muniz, 374 U.S. 150, 164–65 (1963) (failure to comply with statutory duties permits suit in federal district court under the FTCA under a negligence theory.); Yosuf v. United States, 642 F.Supp. 415 (M.D.Pa. 1986) (The BOP breached a duty to let a prisoner make phone calls to his attorney based on the language from the Code of Federal Regulations.).

theory set out in Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) and in prospect of a future suit against GEE, HOLLIE subpoenaed USPS for copies of the surveillance videotapes in a discovery action. GEE turned over HOLLI's subpoena to a postal paralegal, Susan Aukema, who refused to release these exculpitory surveillance tapes to HOLLIE under a touhy doctrine privilege. HOLLIE put Aukema on notice to preserve these videotapes for a future FTCA and Bivens proceedings that HOLLI would be bringing against GEE and the USA.

41. In early November of 2014, HOLLI learned that AUKEMA had intentionally destroyed the surveillance videotapes supporting HOLLIE's false imprisonment, false arrest and emotional distress claims against GEE. Accordingly, HOLLIE and the trustees electronically filed a form 95 FTCA claim against the USA for AUKEMA and GEE's tortious conduct. See exhibit "29" attached. Plaintiff's sought relief for intentional infliction of emotional distress, false imprisonment/arrest and nuisance; the latter in preventing Plaintiffs from accessing the post office to conduct postal business and for causing Plaintiff's to default in legal proceedings through effective conversion and misdirection of Plaintiff's mail.

42. Between the dates of October and November of 2014, Defendant GEE had HOLLIE arrested two more times for appearing at the post office to conduct postal business with a camera in hand. In early December of 2014, the police showed up at HOLLIE's door step to exercise a criminal trespass complaint by GEE. The encounter was videotaped by HOLLIE. When HOLLIE challenged the right to arrest her for criminal trespass for using a public facility, the police backed down from the arrest, but not before they threatened to arrest HOLLIE in the future if HOLLIE appeared at the post office again to conduct postal business. This videotape is evidence. Accordingly, Plaintiffs amended their form 95 claim against GEE and AUKEMA to include these official threats conveyed through the local police in December of 2014 and for ad infinitum false imprisonment. See exhibit "30" attached for this amended claim.

43. On or about January 3, 2015, Plaintiffs mailed their amended form 95 claim as to GEE and AUKEMA (exhibit "30" attached) and their separate form 95 claim as to HUD employees FLAGG and TAFOYA (exhibit "31" attached) to the civil torts division in Washington D.C. by tracked mailing bearing receipt no. 23123170000014120231. See exhibit "32" attached for mailing receipt.

44. In February of 2016, HOLLIE and Marti sued MWFBI at MWFBI's principle

17

place of the business in Albany County Wyoming. At the outset of this case, MWFBI's retained counsel furthered MWFBI's frauds and discriminatory conduct by ensuring the use of a bias court to achieve their illegal objectives. Those illegal objectives included the following acts:

First, MWFBI along with its counsel conspired to appoint DONNELL to the case, knowing that DONNELL had a substantial stock interest in MWFBI.

Second, in the face of statues and evidence to the contrary, POWERS and SUNDAHL fraudulently claimed that Plaintiff's contract claim against MWFBI bearing a 10 year statute of limitations, was both time barred and barred by the doctrine of laches (refer back to exhibit "21" attached, para(s) 11 and 12);

Third, POWERS & SUNDAHL fraudulently claimed that HOLLIE and Marti had not performed proper service of process upon MWFBI under Wyoming law through service upon the Insurance Commissioner (refer back to exhibit "21" attached, para(s) 13 and 14) when exhibit "23" attached proved these statements re proper service of process were patently false;

Fourth, POWERS & SUNDAHL fraudulently asserted that I did not make an outset demand for repair to the water and septic lines. Refer back to exhibit "20" attached as just one communication HOLLIE sent MWFBI. Moreover, MWFBI waived their right to proof of repair damages once the property was conveyed to HOLLIE by Shanandoah based on an appraised value of the disabled property tendered by Bank of the West, and;

Fifth, POWERS and SUNDAHL did not serve the state process submitted to DONNELL's court upon HOLLIE and Marti so that they could obtain an uncontested dismissal with prejudice judgment against Plaintiff's claims through Plaintiff's failure to appear and defend. [10]

45. POWERS & SUNDAHL subsequently conspired with Judge DONNELL, who was pre-emptorily challenged, to significantly abuse the discovery and witness processes by churning and increasing the cost of litigation. Specifically, the non-immuned attorney defendants corruptly obtained an order from DONNELL forcing HOLLIE and Marti to undergo medical exams and to provide expensive medical expert witnesses to prove their disability status' under the FHA and ADA – when Marti and HOLLIE have long been approved for this status by the SSA, and Supreme Court authority under Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) expressly excepts them from proving this status upon undisputed SSA disability certifications, and further, under the Wyoming Fair Housing Act, Wyo. Stat. 40-25-102 (v) provides that a person is established as disabled when they have a record of their disability impairment with some authority, here the SSA.

---

10. Booker v. Rountree, 155 Cal. App. 4th 1366, 1373 (2007)(fraud and abuse of process claim arises from the fraudulent failure to serve process on a party)

46.	In addition during this litigation, POWERS and SUNDAHL have further engaged in bad faith discovery under the cloak of the state proceeding in DONNELL's court by  seeking matter which has been waived and/or mooted by the impartially determined appraised  devaluation loss on the residence, and upon irrelevant matters to boot.  See an SDT POWERS and SUNDAHL served upon our former town principals at Star Valley Ranch attached hereto as exhibit "24".   As shown therein, the SDT seeks building and town permits obtained by HOLLIE or Marti  since 2013 with full knowledge that the repairs funded by HOLLIE  regarding the deck stairs and 4 support stilts relevant to peril # 12 -- weight of snow, rain and ice on roof -- were not covered under under the policy, and further, said repairs were protected by a  grandfather clause in the state of Wyoming thus requiring no permit.   In addition, see exhibit  "16" attached for like local rule incorporating a grandfather clause :

**6.01015 Building, and structural Maintenance and repair:**
A.	In general,  maintenance and  minor repair  activities do not  require a Building Construction and Alteration Permit and shall include all of the following:
1.	The intent to preserve the original condition of a building or structure **or to return a damaged/deteriorated building or structure or a component thereof to its predamaged/ deteriorated condition;**

47.	In addition, the SDT asks for other irrelevant matter such as :

road division records, dog/cat registration(s), county sheriff records, emergency operator records, first responder (police, fire, sheriff) records, tax records, voter registration, vehicle registration, town permits, etc.

**yet again having absolutely no connection with the case.** It appears that Defendants POWERS and SUNDAHL are fishing for records pertaining to any criminal acts by me and Marti as pertaining to the Town of Star Valley Ranch. The only existing criminal records pertain to parking "warnings" issued to me in 2013 and 2014, when weather conditions prevented my vehicle from negotiating the hill to our insured residence. As to our tax records and voter registration records, these records too are totally irrelevant to this case. The only relevant record which POWERS and SUNDAHL have not inquired into is the title abstract to the property found at exhibit "9" attached.

48.	Further in continued reference to the SDT, there would be no notes, voice mail messages, email messages, correspondence, records, tapes, recordings, statements, photographs and documents concerning either HOLLIE  or Marti given they  had little to no interaction with town members.   Accordingly,  the defendants are  churning litigation for no

apparent legitimate purpose other than to paper this simple and straight forward case.

49. Last but not least, the MWFBI defendants and their attorneys waived their rights to pursue any of the discovery at hand because the loss valuation to the home from the November 2013 occurrence was already determined by an independent and impartial third party bank appraising the disabled value of the home for "maximum equity" lending purposes. Accordingly, the losses to the resident premises as deriving from the November 2013 occurrence have already been fixed to a minimum amount of $140,000; and therefore any discovery relevant to the "repair" losses is irrelevant and immaterial. In fact, the only loss that can now be disputed is the amounts Plaintiffs are paying for the Green River rental residence and whether Plaintiffs would be limited by that loss to the one year limitation set forth in the MWFBI policy based on MWFBI's fraud.

50. It is also undisputed that HOLLIE and Marti immediately pre-emptorily challenged DONNELL's appointment of judge on the MWFBI case considering DONNELL's actual bias and DONNELL refused to recuse in violation of Plaintiff's 14th amendment right to an impartial tribunal. Any action taken by Donnell after Plaintiff's challenge is void as a matter of state and federal law.

51. POWERS & SUNDAHL have continued their fraud before this court in a motion to dismiss Doc. # 11. For example @ pg. 2 of their motion to dismiss, POWERS and SUNDAHL misrepresent to this court that the claims of Shanandoah Trust, specifically trustees Lisa Nelson and Steve Fritts have no application to them. In fact, given POWERS & SUNDAHL aided in covering up their client MWFBI's fraud and theft acts of Shanandoah's equity interest in Shanandoahs former home, in violation of the Hobbs Act [11] and the wire

---

11. Several federal courts have held that depletion of assets in the forum state creates 5th amendment contacts with this state. See Barnett v. Stern, 909 F.2d 973 (7th Cir. 2000)(Depletion of assets in the forum state through racketeering acts presents contacts with the forum). In re Sattler's, Inc., 73 B.R. 780, 784-85 & n. 4 (Bankr.S.D.N.Y.1987) (Chapter 7 trustee permitted to amend complaint in adversary proceeding to include RICO claim against creditor who allegedly received post petition payments from debtor in depletion of the estate assets.). Furthermore, Judges and Attorneys are not exempt from racketeering claims that deplete assets in the forum. See USA v. Stillo, 94-2678, 94-2679 (7th Cir. 1995)

On July 29, 1993, a jury found Judge Adam Stillo guilty of racketeering and, along with his nephew, lawyer Joseph Stillo, conspiracy to commit extortion under color of official right. Facts: Defense attorney Robert Cooley first met Judge Stillo at a party in 1976. Cooley asked the judge whom he should see

fraud statute[12], Shanandoah necessarily has a RICO claim against POWERS and SUNDAHL as co-conspirators acting in concert with MWFBI. See Davis v. Mut. Life Ins. Co. of New York, 6 F.3d 367, 380 (6th Cir. 1993)(Insurance company that allows it's employees or agents to commit fraud against an insured is liable under theory of agency.) Console, 13 F.3d at 652 (an association-in-fact consisting of a law firm and a medical practice satisfies RICO's definition of enterprise); Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (allowing enterprise consisting of DuPont, its outside law firms, and expert witnesses retained by the law firms and holding that alleged fraudulently induced **"deflated settlement"** was sufficient financial loss to constitute cognizable injury under RICO); **MATTHEWS v. NEW CENTURY MORTG. CORP. 185 F.Supp.2d 874 (2002)** (Fraudulent depletion of equity in home owned by protected person violates the FHA and RICO, citing Eva v. Midwest National Mortgage Bank 143 F. Supp.2d 878-79, 878-79 (N.D.Ohio 2001); See **Handeen v. Lemaire, 112 F.3d 1339, 1350-51 (8th Cir. 1997)** (Here, the Court found that the attorney Firm directed Gregory and his parents to enter into a false promissory note and create other sham debts to dilute and deplete Lemaire's chapter 13 estate to deprive Handeen of a Judgment rightly

---

to fix a criminal case assigned to Judge Stillo. Judge Stillo, knowing that Cooley was a frequent supplier of bribes to other judges and public officials, told Cooley that he would deal with him directly. Not long after the party, Judge Stillo accepted a bribe from Cooley to fix a misdemeanor case. Judge Stillo met with Cooley before trial and agreed to find Cooley's client not guilty. After the trial Cooley met with Judge Stillo in his chambers. Cooley asked the judge whether $100 was an appropriate payment. Judge Stillo responded: "Whatever you think" and accepted the $100 in cash.

In this case, the government relied on a "depletion of assets theory." If Judge Stillo had accepted a bribe from Cooley, the assets of Cooley's law firm would have been depleted. The Hobbs Act proscribes not just successful extortion schemes but attempts to induce a victim engaged in interstate commerce to part with property". The Cooley lawfrm was induced to part with property to obtain specially rulings from Judge Stillo

12. Moreover under 18 USC section 3237, the mail and wire fraud statutes permit jurisdiction in any loci where the mail and wire matter commences or terminates. Clearly wire matter has been sent by MWFBI to Shanandoah at its trust location in Nebraska. Refer back to exhibits "5" and "6" attached. Furthermore, irrespective that postal employees may have obstructed the mail matter, once the mail was dispatched to the Nebraska location, the mail matter created a contact with Nebraska. Therefore there clearly exists 5th amendment contacts with Nebraska.

obtained against Lemaire. While Gregory may have had initial control over his estate, that control was usurped by the firmand its attorneys through their filings with the court. )

52. Furthermore, POWERS and SUNDAHL along with their client MWFBI have interfered with Shanandoah's rights to provide housing to disabled beneficiaries HOLLIE and Marti as described supra.

> **"That plaintiffs may sue under the Fair Housing Act for injuries they have suffered as a result of housing discrimination against third parties is a well established principle."** [citing Trafficante, 409 U.S. 205(1972)].

Advocacy Service, Inc. v. Babin, 18 F.3d 337, 344-46 (6th Cir. 1994) (we acknowledge that the phrase "otherwise make unavailable" might **extend to "other actors who, though not owners or agents, are in a position directly to deny a member of a protected group, housing rights.").** The Fair Housing Act makes it unlawful to "coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, ... **or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right** granted or protected by [the Act]." 42 U.S.C. § 3617. Nelson and Fritts as Nebraska trustees of the subject real property **may sue under the Fair Housing Act for injuries they have suffered as a result of housing discrimination against third parties, here HOLLIE and MARTI.** *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205,*93 S. Ct. 364, 34 L. Ed. 2d 415 (1972). In addition, it is undisputed that subjecting disabled household members to prolonged unsafe conditions of sewage orders, contamination, black mold and fungi, state an FHA claim. See Simon v. Solomon, 385 Mass 91, 431 N.E.2d 556 (1982) (court upholds jury award of $335,000.00 against landlord for reckless infliction of emotional harm and breach of covenant of quiet enjoyment when water and sewage from an adjoining area flooded Plaintiff's apartment on more than one occasion.); Also using abusive tactics to coerce settlements states a section 3617 claim. Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376,392,397-98 (1970).

53. Moreover POWERS and SUNDAHL are also liable for FHA and ADA violations against Plaintiffs under the theory of agency. Specifically, POWERS and SUNDAHL became aware that MWFBI had initially attempted to increase Plaintiff's insurance premiums mid policy term; had unilaterally terminated Plaintiff's "advanced paid" policy based on HOLLIE's disabilities and inability to climb the steep roof of Plaintiff's cabin home during the 2 week storm to strike off the snow and ice; had improperly refused to honor any provisions of the

policy; and after any investigation of the claims became MOOTED and/or were waived by MWFBI, had engaged in unduly intrusive and unauthorized claims investigations through discovery tools. See **Lindsey v. Allstate Ins. Co., 34 F. Supp. 2d 636 (W.D. Tenn. 1999)** (Defendant discriminated against the Lindseys on the basis of their race **by charging excessive premiums for property insurance, offering lower replacement value for appropriately filed claims, denying properly filed claims, and engaging in unduly intrusive claims investigations.).**

54. POWERS and SUNDAHL also became aware that the pretext offered by MWFBI for terminating Plaintiffs policy. i.e. that HOLLIE had failed to pay MWFBI's premiums to current status, was false pretext. Continuing to condone that false pretext by false representations to a court, bottoms a RICO claim. See **Chevron Corporation v. Steven R. Donziger, et al. Case 1:11- cv-00691-LAK-JCF Document 1874 Filed 03/04/14, USDC, (S.D.N.Y. 2014)** (The RICO and fraud claims rest on the allegations that Donziger and others substantially executed and directed a scheme to extort and defraud Chevron of their properties by fabricating or destroying inculpitory evidence, making false statements to U.S. courts, and intimidating and tampering with witnesses.). Other frauds committed by POWERS and SUNDAHL during the Wyoming litigation were: (1) Plaintiffs claims were time barred; (2) Plaintiffs claims were barred by laches; (3) Neither HOLLIE or the trustees had standing to sue POWERS, SUNDAHL or their client; (4) POWERS and SUNDAHL did not encourage their client MWFBI to continue engaging in discriminatory housing practices and ADA violations; (5) MWFBI did not owe HOLLIE an overpayment in policy premiums after MWFBI unilaterally terminated our policy; (6) MWFBI had the right to expect HOLLIE mount the substantially pitched roof as a disabled person and dislodge the mounting snow and ice; (7) MWFBI was authorized as a matter of law to redetermine HOLLIE and Marti's disability statuses with their own privately selected doctors under our FHA and ADA claims; and (8) MWFBI had the right to require Plaintiffs produce medical experts in order proceed on their FHA and ADA claims.

### FIRST CAUSE OF ACTION
### Federal Housing Act And Title III Violations against all defendants
### Except DONNELL and the USA

1. **MWFBI's Failure To Pay For Losses Because HOLLIE (A Person Bearing A Diagnosis of Diastolic Congestive Heart Failure And**

**Chronic Osteoarthritis Of The Spine) Failed To Scale The Severely Pitched Roof During A Two Week Snow Storm To Strike Off Sheets Of Ice And Snow, Violated The FHA And ADA**

54. MWFBI agents orally communicated to HOLLIE via wires that MWFBI was refusing to pay losses occurring from peril #12, the weight of snow and ice on the roof, because HOLLIE bearing a diagnosis of congestive heat failure and chronic osteoarthritis of the spine, failed to mount the the severely pitched roof shown in exhibit "7" attached during the 2 week snow storm and shuck and strike the sheets of ice and snow from the roof line.

First and foremost, not even an athlete of much younger years and in superior condition would have scaled the pitched roof to shuck and strike off the ice and snow. Nevertheless, these grounds conveyed to HOLLIE in late January of 2014 did not authorize MWFBI to refuse payment for Plaintiff's losses. It is clear

55. The elements to a 42 U.S.C. § 3604(b) and 42 CFR § 100.70(d)(4) claims are: (1) the Defendant (2) discriminated against Plaintiff HOLLIE, a protected disabled person, (3) by refusing to (4) provide property or hazard insurance for the subject dwelling or providing such insurance differently (5) because of handicap. **Lindsey v. Allstate Ins. Co., 34 F. Supp. 2d 636 (W.D. Tenn. 1999)** (quoting 24 CFR § 100.70(d)(4)). One of the categories, "service establishments," specifically includes the examples of an insurance office and a "travel service." 42 U.S.C. § 12181(7)(F). Unlawful to provide "goods, services, . . . privileges, advantages, and accommodations" of a place of public accommodation differently. 42 U.S.C. § 12182(a). **"Disability-based discrimination in the terms or conditions of insurance policies surely constitutes an infringement of the "full and equal enjoyment" of an insurance company's "goods, services, . . . privileges, [or] advantages," within the plain meaning of Title III."** Branch., 966 F. Supp. at 1208; Cloutier, 964 F. Supp. at 301-03; Doukas, 950 F. Supp. at 425-26; Kotev, 927 F. Supp. at 1321-23; Attar, 1997 WL 446439 at *10-*12; Baker v. Hartford Life Ins. Co., 1995 WL 573430 at *4.

56. Here, (1) the Defendant MWFBI (2) discriminated against HOLLIE, a protected person, (3) by refusing to (4) provide HOLLIE hazard insurance for the dwelling (5) because HOLLIE as a disabled person was unable to scale the significantly pitched roof during a bad snow storm to shuck/strike off the at least 3 feet thick sheets of ice toppled with snow; thus violating the FHA.

**2. MWFBI Provided Insurance Differently Because HOLLIE's Household Comprised of Disabled Persons**

57. Here, (1) the Defendant MWFBI (2) discriminated against HOLLIE, a protected person, (3) by providing HOLLIE hazard insurance for the dwelling (4) differently, (5) because HOLLIE's household comprised of disabled persons. 24 CFR § 100.70(d)(4). Specifically, MWFBI defendants attempted to unilaterally increase the policy premiums mid contract without authorization – because MWFBI believed the risk attaching to the subject property was increased based on HOLLIE and Marti's disabilities. While the attempt to increase the premiums failed based on HOLLIE's subsequent notice that an increase in premiums for the same coverage provided non-disabled persons violated the FHA, MWFBI nevertheless under false pretext terminated Plaintiff's insurance coverage on the alleged false grounds that HOLLIE had not paid her insurance premiums basing that termination decision on the inability of HOLLIE's household or the disability trust to fund litigation against MWFBI.

### 3. MWFBI Intentionally Made Housing Unavailable To Disabled Plaintiffs In Violation Of The FHA

58. By refusing to honor the loss of use provisions of the policy even after MWFBI and her attorneys were made aware by Plaintiffs public declaration of this violation when Plaintiffs sued Mountain West to enforce the loss of use provision, MWFBI made rental housing unavailable to Plaintiffs in violation of 42 USC § 3604 and 24 CFR § 100.202. Furthermore, when MWFBI refused to compensate for repairs to the covered dwelling by withholding this insurance and rendering the dwelling unoccupiable due to lack of competent plumbing and sewer services, the MWFBI defendants also made the owned dwelling unavailable. [13]

---

13. Courts have generally held that property and liability insurance are "services" connected to the sale or rental of a dwelling (under FHA § 3604(b)) **and that withholding such insurance makes the dwelling "unavailable" (under FHA§ 3604(a))**. *E.g., NA.A. C.P v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) *("NAACP"); Fuller v. Teachers Ins. Co.*, No. 5:06-CV-00438-F (E.D.N.C., Sept. 19, 2007); *National Fair Housing Alliance v. Prudential Ins. Co.*, 208 F.Supp.2d 46, 57 (D.D.C. 2002) *("NFHA"); Strange v. Nationwide Mut. Ins. Co.*, 867 F.Supp. 1209 (E.D. Pa. 1994). See too Texas Dep't of Hons. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S._ (2015) (Insurance companies that make a dwelling unavailable based on discriminatory purposes prohibited by the FHA held liable.); Jones v. Travelers Cas. Ins. Co. of Am., No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal. Aug. 22, 2013) (insurer ended coverage for rental property upon discovering it housed Section 8 tenants, resulting in alleged disparate impact on the basis of race, sex, age, and familial status); Wai v. Allstate Insurance Co, 75 F. Supp. 2d 1 (D.D.C. 1999) (two landlords

### 4.    MWFBI Interferred With FRITT's (Shanandoah's) Ability To Provide Housing To Declared Disabled Beneficiaries In Violation of 42 USC § 3617 And 4 C.F.R. § 100.204(a)

59.    The FHA makes liable every person who assists in an FHA violation. See " 42 U.S.C. § 3617. *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205,* 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972)(Any person who assists directly or indirectly in an FHA violation is liable to the target of that violation). 4 C.F.R. § 100.204(a) (2002).

60.    Here, MWFBI interfered with Fritt's [through Shanandoah's] ability to provide housing to declared protected persons (by way of SSA certification) under the FHA when MWFBI refused to honor it's commitments under the MWFBI Insurance policy and cover the losses sustained by identified perils in the policy and thus rendered the property uninhabitable. In addition, MWFBI forced Shanandoah and Fritts by assignment as the chief trustee, to leverage the dwelling to avoid financial ruin and finally to convey the dwelling to HOLLIE at a significant "firesale" loss in order to save the dwelling (asset) from foreclosure expenses. This interference is actionable against both the MWFBI defendants and their counsel.

### 5.    MWFBI Violated Title III of the ADA By Denying All Plaintiffs The Full And Equal Enjoyment Of The Insurance Office's Services

---

who rented their homes to people with disabilities were denied standard landlord insurance and were directed to purchase costlier commercial insurance policies. The court held that denial of insurance coverage in an effort to make the home unavailable to the mentally disabled persons was a failure to accommodated thus making the insurers liable.) ; NAACP v. American Family Ins. CO., 978 F.2d 287 (1992)(making insurance unavailable to dwellings for a discriminatory purpose violates the FHAA); City of Edmonds, WA v. Oxford House, Inc. et. al. 514 U.S. 725 (I 995)(Requiring owner to install sprinkling system in home housing drug addicts violated FHAA.); Lindsey v. Allstate Ins. Co., 34 F. Supp. 2d 636, 641-43 (W.D. Tenn. 1999) (finding that the FHA **prohibits discriminatory refusal to renew property insurance);** City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995) ("all practices which have the effect of denying dwellings on prohibited grounds are the unlawful.) The FHA makes illegal the act of "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such services or insurance differently because of [protected status]." 4 C.F.R. § 100.70(d)(4) (2002)); Oxford House, Inc., v. Town of Babylon, 819 F. Supp. 1179, 1185-86 n.10 (E.D.N.Y. 1993) (stating that "a handicapped individual must be allowed to enjoy a particular dwelling, not just some dwelling somewhere in the town") Williams v. The Matthews Co., 499 F.2d 819, 825 (8th Cir. 1974) (The FHA moreover prohibits"sophisticated modes of discrimination as well as the obvious method of discrimination.");

61. In **THANDA WAI v. ALLLSTATE INSURANCE CO. , 75 F.Supp.2d 1 (1999),** the federal court concluded that "Outright rejection of insurance because of Plaintiffs' association with persons with disabilities, plainly constitutes a denial of the "full and equal" enjoyment of the insurance office's goods and services in violation of Title III of the ADA. See Doukas, 950 F. Supp. at 427 ("The language . . . logically extends not only to access to the good, but to the nature of the good itself.").

62. Here, MWFBI outright rejected insurance coverage to Plaintiff Shanandoah Trust and its chief trustee Steven Fritts because of association of the trust with its disabled beneficiaries. Plaintiffs are entitled to all damages accorded thereby.

### 6. MWFBI Violated Title III of the ADA And The FHA By Denying All Plaintiffs Entitlement To Independent Counsel

63. Under Wyoming law, **Gainsco Ins. Co. v. Amoco Prod. Co., 53 P.3d 1051, 1059 (Wyo. 2002), and Crawford v. Infinity Ins. Co., 64 Fed. App'x 146 (10th Cir. 2003),** it was opined that where a conflict of interest exists between the Insurer and the insureds, that independent counsel was required to protect the insured's interests. Under 8th circuit rule, the same holds true. See **United States Fidelity & Guaranty Co. v. Louis A. Roser Co., 585 F.2d 932, 938 (8th Cir. 1978)** (Held USFG must pay for ROSER's independent counsel because a conflict of interest existed between ROSER and USFG.); same in Kansas Bankers Sur. Co. v. Lynass, 920 F.2d 546 (8th Cir. 1990). Accord in San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc. (1984) 162 Cal.App.3d 358. California now refers to this type of representation as Cumis counsel.

64. Plaintiffs allege a clear conflict of interest exists between the insurer MWFBI and plaintiffs as the insureds. Although the amount of actual "building loss damages" to FRITTS as Shanandoah's now assignee is set by waiver of MWFBI to resolve these damages before the insured premises "damage value" was set by an appraiser of Bank of the West (the subsequent lending institution), there remains emotional distress, nuisance, quiet enjoyment and bad faith damages to be decided under the policy. Accordingly, a conflict of interests exists between Plaintiffs and MWFBI as applied to insurance services being outright denied or applied differently under the ADA and FHA. Plaintiff allege that failure of MWFBI to provide Plaintiffs independent counsel of their choice further violates their rights.

### SECOND CAUSE OF ACTION
### Federal Racketeering Act Violations against all defendants.
### Except Against DONNELL (In her personal capacity And The USA)

65.     Plaintiffs allege that all defendants associated in fact to create a criminal enterprise engaging in a pattern of racketeering that exists in open schemes even to today as the illegal objective of the schemes has not yet been accomplished.   See H.J. Inc., 109 S. Ct. at 2904 (scheme is open ended where past conduct projects into the future, threatens repetition and the ultimate objective has not yet been achieved.)

66.     This action involves the ongoing implementation of at least 5 related schemes with multiple victims that originally   commenced in December of 2013.     These related schemes are identified as follows:

(a)   The First Scheme involved the outright denial of insurance after a covered occurrence on the "wire fraud" grounds   that   Plaintiff HOLLIE did not pay her monthly insurance premiums   to keep the coverage "up to date" current. There were 6 victims in this insurance fraud scheme comprising the displaced occupants of the insured dwelling.

(b)     The Second scheme was the denial of "loss of use" rental and displacement benefits.   MWFBI fraudulently represented by telephone wire that Plaintiffs were not entitled to this benefit because it was utilized after MWFBI canceled the insurance policy in question.   In fact this constituted another act of wire fraud because the loss of use benefit attached to the November 2013 occurrence, not to the date Plaintiffs made a demand on execution of this benefit. There were six victims in this wire fraud scheme.

(c)     The Third scheme involved defendant Christinsen and procurment of this defendant to call in and cancel HOLLIE's equipment loan to fund rental expenses at another location, and which true "call in" purpose was to force foreclosure on the insured premises. Although Plaintiffs frustrated Christinsens efforts to employ this scheme by conveying the home to HOLLIE at a "firesale" cost   to acquire mortgage funds to pay off Christinsen,   the attempt to take the home by foreclosure to enure to the fraudulent benefit of MWFBI   counts as a separate scheme to   Plaintiff's RICO claim as a whole.   There were 10 victims in this scheme.

(d)     The Fourth scheme was the depletion of Shandoah's (now Fritts) equity value in the home through MWFBI's extortionate and fraudulent refusal to cover the insured losses based upon the false pretexts' that (i) HOLLIE could have avoided the losses had HOLLIE mounted the roof to strike off the 3 foot sheets of ice toppled with snow and (ii) because HOLLIE had not paid the insurance premiums to date on the at issue policy, MWFBI was entitled to cancel the policy.   The depletion of Shanandoah's (fritts) equity in the home constituted a Hobbs act violation, see **USA v. Stillo, 94-2678, 94-2679 (7th Cir. 1995)**(The Hobbs Act proscribes not just successful extortion schemes but attempts to induce a victim engaged in interstate commerce to part with property"),   and a successful scheme to defraud Shanandoah of properties by use of the wires and mail. There were 4 trustee victims and 8 beneficiary victims of this scheme of extortion and wire and mail fraud.

(e)     The fifth scheme involved defendant GEE 's efforts to tamper with our mail so that we would default in any legal proceedings using the mails   to notice us of pending process. There were 10 victims of this scheme.

67.    During the execution of each of the schemes above referenced,  each defendant at one point in time or another controlled  the affairs of the enterprise and unquestionably participated  in the affairs of the enterprise to meet the ultimate illegal objectives, to wit: to defraud Plaintiffs of their residence property;  their property rights to insurance proceeds; their property rights to rental subsidies;  and their causes of actions.   The control of the enterprise was  and is a dynamic model depending upon which actor is best situated to commit the predicate acts.

68.    Each defendant conspired one with another to commit either directly or indirectly the predicate acts in question.

### THIRD CAUSE OF ACTION
### (Federal Torts Claims Act Against The USA)

69.    Plaintiffs sue the USA for torts committed by federal employees under the Act.

70.    Plaintiffs submitted form 95"s to initiate the administrative process against the USA.  Those form 95's are attached hereto as exhibits "30-31".

71.    Plaintiffs  properly caused  their  administrative claims to be served upon the USDOJ civil torts division.  See exhibit "32" attached.

72.    The USA had  6 months to  investigate into and  settle Plaintiffs claims and have failed to do so.

73.    This court now has jurisdiction over Plaintiffs FTCA claim in this forum where Plaintiffs have a residence.


### FOURTH CAUSE OF ACTION
### BIVENS Violations against defendants GEE and AUK.EMA

74.    GEE  caused HOLLIE  to be arrested on several occasions when HOLLI complained about GEE tampering with  Plaintiffs  mail.    The local police arrested and detained  HOLLIE  at the police station  no less than 3 times and 1 time at Plaintiffs dwelling for allegedly disturbing the peace for videotaping postal activities and on the final appearance for criminal trespass.   GEE violated HOLLIE's first amendment right to videotape public activities, fourth amendment right to be free from seizure without probable cause and fifth amendment rights to not have Plaintiffs mail tampered with by postal employees.

75.    Defendant Aukema destroyed the surveillance videotaped memorializing GEE's tortious acts thus violating Plaintiffs fifth amendment rights to prove up her case with

competent evidence.

## FIFTH CAUSE OF ACTION
### EX PARTE YOUNG and Section 1983 Declaratory Relief against DONNELL

76.   In **CROWE DUNLEVY v. STIDHAM, 640 F.3d 1140 (10th Cir. 2011)** citing *Verizon Md, Inc. v. Pub. Serv. Comm'n,535* U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 87 (2002) and *Va. Office for Protection Advocacy v. Stewart,* _U.S._, 131 S.Ct. 1632, 1638-39, _ L.Ed.2d _ (2011), the Tenth Circuit affirmed that a prayer for injunctive relief asking "that state official be restrained from enforcing an order in contravention of controlling federal law" satisfies *Verizon's* straight forward inquiry. *Verizon,* 535 U.S. At 645, 122 S.Ct. 1753. *Verizon's* direction does not limit the *Ex parte Young* inquiry to whether federal constitutional or statutory law has been violated.

77.   Here DONNELL is absolutely immuned for his conduct with respect to money damages but not equitable relief DONNELL has made a number of orders with knowledge and intent of violating Plaintiffs federal constitutional rights with prospective harm to Plaintiffs. Plaintiffs seek a declaratory decree that DONNNELL had violated Plaintiffs constitutional rights and an injunction enjoining future application of any order doing so.

## SIXTH CAUSE OF ACTION
### (Breach of Contract;  Breach of the Covenant of Good faith Fair dealing   against the Insurance Defendants)

78.   Plaintiffs also bring state law causes of action for breach of contract,  Breach of the covenant of good faith and fair dealing and of the covenant of quiet enjoyment  against the Insurance Defendants.  Plaintiffs policy clearly did not  include a promise by HOLLIE to mount a dramatically inclined roof to remove ice and snow.  Plaintiff's  policy provided written notice was required before increasing a  policy premium during the renewal period,  not during execution of the agreed policy amount.    Plaintiff's  policy required written 30 days notice before cancellation of the  policy.  Plaintiff's policy did not limit the use of loss damages to the time the policy holder sought this benefit but rather attached this loss to the occurrence causing this loss.  Defendant MWFBI materially breached all of these terms to Plaintiffs substantial  damages.  Plaintiffs are entitled to all  damages as accorded by law.

## SEVENTH CAUSE OF ACTION
### (Emotional Distress against all except DONNELL)

79.     Plaintiffs have suffered emotional harm from the defendants conduct. Under Wyoming law, State Farm Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813 (Wyo. 1994) (emotional distress damages are available as a separate tort if the Plaintiff has suffered economic loss of any kind.); Under Nebraska law, Sabrina W. v. Willman, 4 Neb.App. 149, 540 N.W.2d 364 (1995) (finding emotional distress need not be severe to be compensable under claim for invasion of privacy); **Wilkinson v. United States, 564 F.3d 927 (8th Cir. 2009),** the 8th circuit affirmed a judgment holding the United States liable to the Wilkinson's on an emotional distress claim only – for more than three years of repeated trespass onto to Wilkinson's farm property.); In McCabe v. Parker, 608 F.3d 1068 (8th Cir. 2010)(the Plaintiffs were awarded $750,000 as damages on an emotional distress claim only – for being subjected to a strip search after being seized on a misdemeanor charge of disturbing the peace). In Curtis v. Loether, 415 U.S. 189 (1974), the Supreme Court concurred that emotional distress damages were proper in discrimination cases.

80.     Plaintiffs seek emotional distress damages against the defendants for the outrageous conduct of making Plaintiffs live in abhorrent and unsafe living conditions under the promise to pay out repair damages, for the stress of having to lien personal farm properties at high interest rates to subsidize relocation and loss of use damages deny by MWFBI, for repeated trespass, nuisance and deprivation of Plaintiff's quiet enjoyment of the properties, on and on.

### EIGHTH CAUSE OF ACTION
### (Breach of the Covenant of Quiet Enjoyment AND Nuisance against all Defendants except DONNELL)

81.     Plaintiffs aver that all defendants committed the breach of the covenant quiet enjoyment and nuisance against Plaintiffs when they caused Plaintiffs' to be constructively evicted and caused plaintiffs to be subjected to deplorable living conditions while Plaintiffs were put on hold with respect to covering Plaintiff's claims.

### NINTH CAUSE OF ACTION
### (Constructive Trust Against the Insurance Defendants)

82.     Plaintiffs seek constructive trust over all of their insurance proceeds.

WHEREFORE, PLAINTIFFS pray as follows:

1. For all compensatory, general and punitive damages as allowed by law;

2. For all equitable and injunctive relief allowed by law;

3. For Pre and post judgment interest;

4. For Treble damages under the RICO claim.

5. For EX PARTE YOUNG and section 1983 declaratory relief against DONNELL

6. For trial by jury on Plaintiff's private claims and trial by advisory jury on Plaintiff's FTCA claims

7. For all attorneys fees and court costs as allowed by law,

Dated: September 3, 2016

_____
HOLLIE TELFORD

_____
STEVEN FRITTS

1

I have been asked to do an evaluation on Holly Lundahl because of high blood pressure, heart issues, and malignant hypertension.

An EKG was performed. She has left atrial enlargement and premature atrial contractions.

I was also authorized to do a stress test on the treadmill if it was contraindicated. Her blood pressure today contraindicates this from being done.

This is a woman who has a past medical history of a myocardial infarction in 1995. Allegedly a drug caused it. She had CVA's in 2007, 2008. She has had breast and skin cancer as well. She also has a history of physical trauma which damaged her spinal cord and gave her paralysis for awhile.

She has had a mastectomy, two back surgeries, two hip surgeries, and some type of gastric surgery.

She does have episodes of chest discomfort. This is located in the epigastric substernal area with radiation towards the left side of the chest and into the left arm. The severity of this varies. The strongest feels like lactic acid would feel when you have overworked a muscle. It will last somewhere between 10 and 30 minutes. Nitroglycerin may relieve it after about 20 minutes.

If she walks quickly, she will get out of breath really fast. She will have a few episodes of orthopnea. She has a few episodes of PND. She does not have a supine cough.

She does have episodes of palpitations. She has been told that this has been atrial fibrillation. This may occur once or twice a week. These episodes often make her dizzy and light-headed.

ADJ: Amy K.

FINDINGS:

1. The rhythm is sinus at a rate of 86 beats per minute.
2. The PR interval is 170 msec, the QRS duration is 70 msec, and the QT interval is 320 msec.
3. Abnormal P-waves consistent with left atrial enlargement.
4. Premature atrial contractions.


Kim J. Coffman, MD, FACC
Cardiovascular Medicine

Additional symptoms are that she does have bad eyes and her vision tends to be blurry. She always feels cold. It almost sounds like she has some form of hypoglycemia. If she eats every couple of hours she does much better. She develops charlie horses at night. She has difficulty in general with sleeping.

She has had high blood pressure for a fair period of time. One of the lowest pressures that she told me about was about 190/115. She does not remember having an echocardiogram. She does not remember having a renal ultrasound.

Her current medications include lisinopril 10 mg bid, amlodipine 10 mg bid, and aspirin 1 tablet tid. At one time she was on hydrochlorothiazide and clonidine. She has not been on hydralazine. She has not been on a beta-blocker. Other than the amlodipine, she has not been on a calcium-channel blocker.

On examination her weight is 143 pounds. She is 5 foot 8 inches tall. Her blood pressure was 230/110. Her pulse when she walked in was 140 and irregular with extrasystoles. When I examined her, her heart rate was 100 with extrasystoles. Her respiratory rate was 24. Room air saturations was 96%. Ear, nose, mouth, and throat showed no cyanosis. The eyes have no corneal arcus. There is an abnormal light reflex from the arteries. They are all visibly narrowed with significant AV nicking. I do not see hemorrhages or exudates. There is no jugular venous distention upright. Supine it is 4 cm. Her respirations are unlabored and clear to auscultation. The PMI is sustained. S1 and S2 are normal. No murmur present. She does have an S4 gallop. No rub. The abdominal aorta is palpable but no bruits. It does not seem to be dilated. The carotids are 2+ bilaterally without bruits. The femorals and pedals are 1-2+ bilaterally. There is trace ankle edema. Her left foot is cooler than the right. GI exam was unremarkable with no masses or tenderness, and no hepatosplenomegaly. Her gait is unremarkable. The digits and nails show no clubbing or cyanosis. The skin is warm and dry although the left foot is cooler. No signs of venous status. She is alert and oriented. No dysarthria. She comprehends and understands. Mood and affect are calm.

EVALUATION AND MANAGEMENT:
1. Hypertension. She certainly has high blood pressure. Today her blood pressure is 230/110. At that level, I think it is unsafe for her to undergo and exercise stress test.
2. Chest discomfort.

3. Shortness of breath. She has significant shortness of breath when she exerts herself very much. She also has some subtle symptoms when she is supine. She will get a little bit of orthopnea and PND from time to time. She does not have much peripheral edema. It is mostly at the sock line. I think her shortness of breath is related to cardiac factors. Usually with people with severe hypertension, their end diastolic pressures are so high that this pressure is transferred back to the lungs and a pulmonary capillary wedge pressure rises, and it causes significant shortness of breath. Thus I would have to label her as having congestive heart failure. I believe this is diastolic heart failure. Certainly    infarction seems to be present by EKG. Thus I think she has diastolic congestive heart failure and is Functional Class II-III.



ID: #121011100627
Lundahl, Hollis

D.O.B.: 05/27/1956   56 Years
Male:
Class:
Dr:
Tech:

10/11/2012 10:06:35

Sinus rhythm with PAC(s).

Borderline ECG

left atrial enlargement.

| Vent. Rate: | 86 bpm |
| RR Interval: | 691 ms |
| PR Interval: | 164 ms |
| QRS Duration: | 82 ms |
| QT Interval: | 344 ms |
| QTc Interval: | 389 ms |
| QT Dispersion: | 18 ms |
| P Axis: | 81 deg |
| QRS Axis: | 50 deg |
| T Axis: | 76 deg |

* Unconfirmed Analysis *

Comment:

2

University of Utah Hospitals and Clinics
Salt Lake City, UT

## PET CT Skull Base To Mid-Thigh

LUNDAHL, MARTI - 20740634

* Final Report *

| | |
|---|---|
| Result Type: | PET CT Skull Base To Mid-Thigh |
| Service Date: | 24 April 2014 12:58 |
| Result Status: | Final |
| Result Title: | NPETCTST |
| Authored By: | Koppula, Bhasker, MD on 24 April 2014 12:58 |
| Electronically Signed By: | Koppula, Bhasker, MD on 24 April 2014 12:58 |
| Encounter Info: | 198067277, UHOSP, Outpatient, 04/24/2014 - 04/24/2014 |

## * Final Report *

**NPETCTST**
Indication: Cervical cancer staging

History: Cervical cancer with biopsy one week ago

Comparison/Correlation: None

Examination: FDG PET/CT scan of the whole body

Date of Exam: 4/24/2014

Procedure: The patient was fasted for 6 hours, resulting in a serum glucose of 73 mg/dl.
15.2 mCi 18-F FDG was injected intravenously. 86 minutes later, a PET scan was performed
from the head through the mid thigh. A contrast enhanced CT was performed over the same
region for attenuation correction and anatomic co-registration. A dedicated lung CT was
also performed.

Findings:

HEENT: Symmetric cerebral metabolic activity. No abnormal areas of enhancement within the
intracranial structures. The major cerebral vessels opacify normally. The orbits are
unremarkable. Small retention cyst of the right maxillary sinus with the remaining
paranasal sinuses are well aerated. Mastoid air cells are well-aerated. Debris within the
left external auditory canal likely representing cerumen. No hypermetabolic or enlarged
cervical chain lymph nodes. Thyroid is homogeneous.

Chest: The heart is normal in size without pericardial effusion. No central pulmonary
artery filling defect. No consulted capacity. Subsegmental dependent atelectasis in the
bases bilaterally. Sub-5 mm pulmonary nodules in the left lower lobe (series 10 image 70)
is too small to characterize by PET. No hypermetabolic foci within the lung parenchyma.

Enlarged right hypermetabolic axillary lymph node with additional smaller adjacent node.
Largest node measures 13 mm (series 4 image 124) with a max SUV of 23.3. No enlarged or

## PET CT Skull Base To Mid-Thigh

* Final Report *

hypermetabolic mediastinal or hilar lymph nodes.

Abdomen and pelvis: The liver is in normal in appearance without focal hypermetabolic lesion. The gallbladder, spleen, a 1 cm splenule and pancreas are unremarkable. Subcentimeter hypoattenuating lesion within the superior pole the right kidney is too small to characterize. Right hydronephrosis and hydroureter. Asymmetric renal nephrograms with decreased attenuation on the right. The left kidney is normal. Mild left hydroureter adjacent to the uterus at the level of the ovary. Oral contrast is present within the cecum. No evidence of bowel obstruction or perforation. Appendix is normal. Large amount of stool is present throughout the length of the colon. Bladder is unremarkable.

Hypermetabolic upper cervical mass measures 4.7 x 3.2 cm (series 6 and image 40) an extends in a craniocaudal diameter for 3.2 cm (series 611 image 63). This involves the lower uterine segment. This lesion has a maximal SUV of 19.9. Pericervical fat stranding is present. Circumferential uterine wall thickening without focal mass or hypermetabolic activity. Hyperattenuating material within the endometrial cavity. Mild metabolic activity within the ovaries bilaterally without underlying mass.

Posterior to the right psoas muscle is a soft tissue attenuating lesion that measures 15 x 12 mm best seen on series 4 image 229 and series 610 image 74.

Musculoskeletal: Right femoral nail with interlocking screw. Sub 5-mm sclerotic foci within the superior portion of the right femoral head likely representing a bone island. Within the L2 vertebral body is sclerotic foci within the L2 vertebral body measures 9 mm (series 4 image 27) without hypermetabolic activity likely representing a bone island. Multilevel degenerative change of the cervical and lumbar spine.

Dermal and subcutaneous: Ill-defined hyper attenuating mass within right breast at 12:00 measures 2.7 x 2.6 cm (series 4 image 144) with a maximum SUV of 19.7. The left breast tissue is unremarkable.

Impression:
1. Hypermetabolic cervical/lower uterine mass consistent with known diagnosis of cervical cancer.

2. Hypermetabolic retroperitoneal right soft tissue density posterior to the right psoas muscle concerning for metastasis.

3. Ill-defined hypermetabolic mass within the right breast with hypermetabolic right axillary lymph nodes consistent with separate breast primary with metastatic lymph node disease.

4. Right hydronephrosis and hydroureter secondary cervical mass. Asymmetric right renal

## PET CT Skull Base To Mid-Thigh                    LUNDAHL, MARTI - 20740634

\* Final Report \*

nephrogram could be related to back pressure from hydronephrosis representing edema.

5. Sub-5 mm pulmonary nodule within the left lower lobe that is too small to characterize.

I have personally reviewed the images for this examination and agree with the report attached

St John's Medical Center
Jackson, Wyoming

Chart Copy

Operative Report

| Patient: | LUNDAHL, MARTI | Physician: | MAURA J LOFARO MD |
| Acct #: | 30541322 | Att. Physician: | MAURA J LOFARO MD |
| | | MR #: | 1762093 |

Disch. Date:  04/17/2014

REVISED COPY

DATE OF OPERATION: 04/17/2014

SURGEON: Maura J. Lofaro, M.D.

PREOPERATIVE DIAGNOSIS: Cervical mass.

POSTOPERATIVE DIAGNOSIS: Cervical mass.

PROCEDURE PERFORMED: Examination under anesthesia with cervical biopsies and endocervical curettage.

ANESTHESIA: LMA.

INDICATIONS: A 50-year-old, para 1 with a large cervical mass, irregular heavy vaginal bleeding, and no Pap smear in greater than 18 years.

PROCEDURE DESCRIPTION: The patient was taken to the operating room and placed in a supine position. After smooth induction of general anesthesia, she was placed into the lithotomy position. She was prepped and draped in the usual sterile fashion and her bladder was drained with a red rubber catheter. Examination under anesthesia was performed. External genitalia were those of a normal female. BUS negative. The vagina was mildly atrophic. On bimanual exam, the patient had a barrel cervix approximately 7 cm in diameter that extended to the bilateral sidewalls on rectovaginal exam and also extended approximately halfway into the vagina, encompassing the vaginal wall. The patient had an approximately 6- to 8-week-sized uterus. The adnexa demonstrated no masses.

A speculum was inserted into the vagina. There was a large necrotic exophytic tumor. Multiple biopsies were taken circumferentially around the tumor. Endocervical curettage was also performed and the endocervical curettings were sent to Pathology along with the cervical biopsies in 2 separate containers for permanent section. I attempted to place a uterine sound into the endometrial cavity in order to obtain endometrial curettings. However, the tumor was obliterating the endocervical canal close to the internal os and I was unable to dilate her cervix.

Monsel solution and pressure were applied to the biopsy site until hemostasis was confirmed. The speculum was removed from the vagina. The patient was taken out of lithotomy position, awakened from anesthesia, and taken to the recovery room in satisfactory condition. All instrument counts were correct. She received Ancef perioperatively for antibiotic prophylaxis and had SCDs in place for our prophylaxis.

APR 18 2014

3

# SHANANDOAH INVESTMENTS

**Entity Number:** 2104933-0180
**Company Type**
**Address:** 4139 N DEVONSHIRE CR Provo, UT 84601
**State of Origin:** UT
**Registered Agent:**
**Registered Agent Address:**

[View Management Team]

Unknown, NA 00000

Status Expired

**Status:** Expired ⊙ *as of 02/01/1996*
**Status Description:**

History

[View Filed Documents]

**Registration Date:** 12/19/1991

Additional Information

**NAICS Code: 9999 NAICS Title** 9999-Nonclassifiable Establishment

<< Back to Search Results

Search by:   Business Name   Number   Executive Name   Search Hints

Business Name:

4

Peter H. Christensen (7-4861)
Ryan P. Atkinson (7-5082)
Steven J. Trayner, *Pro Hac Vice*
STRONG & HANNI
3 Triad Center, Suite 500
Salt Lake City, Utah 84180
Telephone: 801-532-7080
Facsimile: 801-596-1508
pchristensen@strongandhanni.com
ratkinson@strongandhanni.com
strayner@strongandhanni.com
*Attorneys for Defendants Rosemary Ivins and Edward L. Nelson Realty*

IN THE THIRD JUDICIAL DISTRICT COURT FOR THE STATE OF WYOMING

IN AND FOR LINCOLN COUNTY, AFTON BRANCH

| | |
|---|---|
| STEVE FRITTS AND LISA NELSON AS TRUSTEES TO SHANANDOAH TRUST; MARTI LUNDAHL AND HOLLY TELFORD, <br><br> Plaintiffs, <br><br> vs. <br><br> EDWARD L NELSON; NAUNIE NELSON; ROSEMARY IVINS and DOES 1-10, <br><br> Defendants. | STIPULATION AND MOTION FOR ORDER OF DISMISSAL WITH PREJUDICE <br><br><br> Civil No: CV-2013-18 |

Plaintiffs, by and through counsel of record, and defendants by and through counsel of record, stipulate that said plaintiff's complaint and all claims contained therein, whether alleged or not alleged, pleaded or not pleaded, have been settled, compromised, and resolved in full, and

that said complaint and all such claims may be dismissed, with prejudice, on the merits, the parties to bear their own respective costs and fees.

The parties through counsel, move the court for an order pursuant hereto.

DATED this _____ day of September, 2013

_____
Jack Edwards
Attorneys for Edward L. and Nannie Nelson

DATED this _____ day of September, 2013.

_____
Peter H. Christensen
Attorneys for Defendants Rosemary Ivins and Edward L. Nelson

DATED this _____ day of September, 2013.

_____
Holli Telford aka Holli Lundahl Telford

DATED this _____ day of September, 2013

_____
Marti Lundahl

DATED this __9__ day of September, 2013.


_: Steven-Kay:Fritts._
Steve Fritts


DATED this _____ day of September, 2013.

_Lisa Nelson_
Lisa Nelson


DATED this __9__ day of September, 2013.


_: Steven-Kay:Fritts._
Shanandoah Investment Trust aka
Shanandoah Trust

By _: Steven-Kay:Fritts._
Its _Chief_ _Truster_

Description of Attached Document

Title or Type of Document Stipulation and Motion for Order of Dismissal

Document Date 9/9/2013     Number of Pages 4

## Acknowledgment

State of Utah

County of Utah

On this day of September 9 in the year 2013, before me, Tim Johnson a notary public,
personally appeared Marty Telford Liddall, proved on the basis of satisfactory evidence to be
the person(s) whose name(s) (is/are) subscribed to this instrument, and acknowledged (he/she/they)
executed the same.

Witness my hand and official seal.

_____
Notary Signature and Seal

TIM JOHNSON
Notary Public • State of Utah
Commission # 653437
My Commission Expires
March 5 2016

---

Description of Attached Document

Title or Type of Document Stipulation and Motion for Order of Dismissal

Document Date 9/9/2013     Number of Pages 4

## Acknowledgment

State of Utah

County of Utah

On this day of Sept. 9 in the year 2013, before me, Tim Johnson a notary public,
personally appeared Hill Telford Liddall, proved on the basis of satisfactory evidence to be
the person(s) whose name(s) (is/are) subscribed to this instrument, and acknowledged (he/she/they)
executed the same.

Witness my hand and official seal

_____
Notary Signature and Seal

TIM JOHNSON
Notary Public • State of Utah
Commission # 653437
My Commission Expires
March 5 2016

Description of Attached Document

Title or Type of Document Stipulation and Motion for order of Dismissal

Document Date 7/9/2013    Number of Pages 4

Acknowledgment

State of Utah

County of Utah

On this day of Sept. 9 in the year 2013, before me, Tim Johnson a notary public, personally appeared Steven Ray Fritts, proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to this instrument, and acknowledged (he/she/they) executed the same.

Witness my hand and official seal.

_____
Notary Signature and Seal

**TIM JOHNSON**
Notary Public • State of Utah
Commission # 653437
My Commission Expires
March 5 2016

Description of Attached Document

Title or Type of Document STIPULATION & MOTION FOR ORDER OF DISMISSAL

Document Date 9/9/13    Number of Pages 4

Acknowledgment

State of Utah

County of UTAH

On this day of 9/9 in the year 2013, before me, Colby Nelson a notary public, personally appeared Lisa Nelson, proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to this instrument, and acknowledged (he/she/they) executed the same.

Witness my hand and official seal.

_____
Notary Signature and Seal

NOTARY PUBLIC
COLBY NELSON
Commission # 602285
My Commission Expires
October 30, 2014
STATE OF UTAH

5

 Mountain West Farm Bureau
Mutual Insurance Company
931 Boulder Drive
Laramie, WY 82070-5131

**EVIDENCE OF INSURANCE**
This is to certify that Mountain West Farm Bureau Mutual
Insurance Company has the following insurance in force and
coverage will continue until canceled.

Agent  Lea Bonnecaze

Agent Address PO Box 9810
　　　　　　　Jackson, WY 83002

Phone # 307.733.3813

Insured  Holli Telford & Marti Lundahl

Insured's Address  HC 62 Box 7546
　　　　　　　　　　Star Valley Ranch, WY 83127

Fax #　307.739.2287

| Policy Type | | Policy Number NEW |
| --- | --- | --- |
| ___ Country Squire | ✕ Homeowners | Effective Date 08/09/2013 |
| ___ Country Home | ___ Mobile Homeowners | Expiration Date 08/09/2014 |
| ___ City Squire | ___ Dwelling Property | This policy period begins and ends at 12:01 a.m standard time at the residence premises. |

**Property Type:**
___ Standard Form (Peril X)

✕ Deluxe Form (Peril Z)

___ Special Form (Peril Z)

___ Dwelling Property

✕ Replacement Cost
(Up to limit of coverage amount listed below)

Legal Location  322 Vista East Dr
　　　　　　　　Star Valley Ranch, WY 83127

Coverage Amount $129,000

Annual Premium $528.70

Deductible $1,000

Mortgagee　　　　　　Loan #

**Automobile**

Year

Make

Model

VIN Number

BI/PD　　　　　　Medical

UM/UIM

Comp. Deductible

Collision Deductible

Lienholder　　　　　Loan #

This binder is issued subject to all the terms and conditions of the policy regularly issued by the company in the state where the property is located  This binder is valid when signed by an authorized agent of this company and upon receipt of premium.

You may cancel this binder at any time by returning it to us or by letting us know in writing the date cancellation is to take effect. This binder may be canceled by the Company with written notice to the insured at least 45 days prior to the cancellation date. This notice will be mailed or delivered to the address shown above. The effective date of cancellation stated in the notice shall become the end of the binder period.

AGENT _____　　　DATE  08/13/2013

UND172 (02/09)

6

# RE: Telford/Lundahl Insurance Follow-up

### Lea Bonnecaze

Tue 8/13/2013 10:38 AM

To hollie telford <hollietelford@hotmail.com>;

Cc Shanandoah.Trust@gmail.com <Shanandoah.Trust@gmail.com>;

📎 1 attachment (19 KB)

Telford EOI.pdf;

Hi Holli,

A. ached please find evidence of insurance on your home. I have copied Shanadoah Trust on this email. If there is a mortgagee clause or other addi onal informa on that needs to be included, please have them contact me.

Thank you for the home – what a beau ful property with the pond and fountain out front!

Lea

**Lea Bonnecaze**
**Agent**
Farm Bureau Financial Services
Insurance · Investments
PO Box 9610
Jackson, WY 83002
Phone 307.733.3813
Fax 307.739.2287
Cell 307.690.3232
lbonnecaze@mwfbi.com

Registered Representa. ve/
Securi es & services offered through

FBL Marke ng Services, LLC[+]
5400 University Avenue
West Des Moines, IA 50266
877/860-2904, Member SIPC

Mountain West Farm Bureau Mutual Insurance Company

Farm Bureau Life Insurance Company[+*]

[+]Affiliates *Company provider of Farm Bureau Financial Services

From: hollie telford [mailto:hollietelford@hotmail.com]
Sent: Tuesday, August 13, 2013 10:22 AM
To: Lea Bonnecaze
Subject: RE: Telford/Lundahl Insurance Follow-up







8


**Farm Bureau**
Family of Insurance Services

HOMEOWNERS - ADDITIONAL POLICY DECLARATION     WS1471

SCHEDULE OF COVERAGE

SECTION I - PROPERTY COVERAGE

POLICY NO. 4H082766                    TELFORD, HOLLI          9/07/13

LIMITS OF LIABILITY
COV A       COV B       COV C

| ITEM NO. | YOUR DWELLING | LOSS (1) OF USE | PERSONAL (1) PROPERTY | DED | PERIL CODE | PREMIUM AMOUNT | MORT. NO. |
|---|---|---|---|---|---|---|---|
| 01 DWELLING (RC) | 129,000 | 25,800 | 90,300 | 1000 | Z | 483.70 | |

LOC ID = 0
  FO-20.113(05/97)  REPLACEMENT COST - COVERAGE C APPLIES TO ITEM 01
  FO-20.137(05/13) BACK UP OF SEWER OR DRAIN   10,000          45.00
  APPLIES TO ITEM 01
INSURED LOCATION ITEM 01 322       VISTA EAST DR                ACRES 1

TOTAL PREMIUM                                                   528.70

FOR ITEMS MARKED (RC), THIS POLICY HAS BEEN ENDORSED TO PROVIDE REPLACEMENT
COST COVERAGE ON THE CONTENTS WHICH SUPERSEDES ACTUAL CASH VALUE COVERAGE,
SUBJECT TO THE CONDITIONS SET FORTH IN FORM FO-20.113(05/97).

(1) COVERAGE APPLIES INDIVIDUALLY AND SEPARATELY
  TO EACH SCHEDULED ITEM.

FO-10.122(04/97)

9

| 762921 | New York Guardian Mtg. Corp. | Metmor Financial Inc. | Assgn. Mtg | | Aug 17 1992 | Apr 9 1993 |
| 751145 | Mellon Mtg Co | Star Valley State Bank | Assgn | | May 24 97 | Jun 26 97 |
| 865417 | Edward L Nelson | First Security Bank | Mtg | 36,500.00 | Dec 8 73 | Dec 19 93 |
| 856017 | Pat Hust Bank | Edward L Nelson | Cert of As | | Jan 2 97 | Jun 14 97 |
| 871663 | 7 50 | Mers | assgn | | 3/01 | 2001 |
| 906626 | Edward L Nelson | The public | Affid | | 5 05 | 2 22 |
| 906627 | | Edward S Nelson | Q-C | 10 00 | | |
| 939971 | Mers | | Rel | | 11 13 07 | 19 07 |

| 948373 | STAR VALLEY RANCH ASSOC. | TOWN OF STAR VALLEY RANCH | ORDER | | 6 13 07 | |
| 959898 | STAR VALLEY ASSOC. | THE PUBLIC | CCAR | | 6 30 11 | 6 |
| 961365 | STAR VALLEY RANCH ASSOC. | THE PUBLIC | CCAR | | 8 16 11 | 11 |
| 765417 | Edward L Nelson | Edward L Nelson etal | WD | | 12 27 12 | 7 13 |
| 973247 | | Lisa E Nelson | Q-C | 1000 | 9 12 13 | 17 13 |
| 990739 | Lisa E Nelson Trust | Nelson Telford | Q-C | 1000 | 12 3 14 | 16 1 |
| 191748 | Frill e Telford | B C Tu | Mtg | | 5 7 15 | 2 1 |

10

Close Window    Print Screen

## View Transaction Printable View

### Transaction Information

| | |
|---|---|
| **Account:** | Basic Checking - xxxxx1234 |
| **Description:** | CHECK |
| **Amount:** | $-89.12 |
| **Status:** | Cleared |
| **Customer Reference Number:** | 120 |
| **Transaction:** | Check 120 |
| **Date Cleared:** | August 19, 2013 |
| **Date Initiated:** | August 19, 2013 |

Close Window    Print Screen

## View Transaction Printable View

### Transaction Information

| | |
|---|---|
| **Account:** | Basic Checking - xxxxx1234 |
| **Description:** | MOUNTAIN WEST FB 830181634/Prem#t CHKFPD*H******* TELFORD, HOLLI REF # 013252008335381 |
| **Amount:** | $ |
| **Status:** | Cleared |
| **Transaction:** | Debit |
| **Date Cleared:** | September 10, 2013 |
| **Date Initiated:** | September 10, 2013 |

Close Window  Print Screen

View Transaction Printable View

Transaction Information

| | |
|---|---|
| **Account:** | Basic Checking - xxxxx1234 |
| **Description:** | MOUNTAIN WEST FB 83018163 4Premal CHKFPD H ****** TELFORD, HOLLI REF # 013281001589144 |
| **Amount:** | $-44.06 |
| **Status:** | Cleared |
| **Transaction:** | Debit |
| **Date Cleared:** | October 09, 2013 |
| **Date Initiated:** | October 09, 2013 |

Close Window   Print Screen

View Transaction Printable View

## Transaction Information

| | |
|---|---|
| **Account:** | Basic Checking – xxxxx1234 |
| **Description:** | MOUNTAIN WEST FB 830181634Premst CHKPPCHT******* TELFORD, HOLLI REF # 013316006283597 |
| **Amount:** | $-45.06 |
| **Status:** | Cleared |
| **Transaction:** | Debit |
| **Date Cleared:** | November 12, 2013 |
| **Date Initiated:** | November 12, 2013 |

Close Window Print Screen

View Transaction Printable View

Transaction Information

| | |
|---|---|
| **Account:** | Basic Checking - xxxxx1234 |
| **Description:** | 2469215QN00PQG1WH MWFB-INSURNCE-INST-PAY 307-745-4835 WY |
| **Amount:** | S-93.11 |
| **Status:** | Cleared |
| **Transaction:** | Debit |
| **Date Cleared:** | January 07, 2014 |
| **Date Initiated:** | January 07, 2014 |

11



12

10. **"Your" Duties After Loss.** In the event of a loss to covered property, the following duties must be performed:

a. Give prompt notice to "us" or "our" agent.

b. Cooperate with "us" in the investigation of the claim.

c. Promptly notify law enforcement in case of loss by any criminal act.

d. Promptly notify the credit card or fund transfer card company in case of loss under the Credit Card, Bank Transfer Card, Forgery and Counterfeit Money coverage.

**** e. Protect the property from further damage. If repairs to the property are required, "you" must:
  (1) Make reasonable and necessary repairs to protect the property; and
  (2) Keep an accurate record of repair expenses.

f. Prepare an inventory of all damaged, destroyed, lost, or stolen or other property for which claim is made, including, but not limited to, the following information:
  (1) Quantity;
  (2) Description;
  (3) Value at the time of loss;
  (4) Purchase price and date purchased; and
  (5) Bills, receipts and related documents that support the claimed loss and the figures in the inventory.

g. As often as "we" reasonably require:
  (1) Show "us" the damaged property;
  (2) Provide "us" with records and documents "we" request and permit "us" to make copies; and
  (3) Submit to examination under oath, while not in the presence of any other "insured," and sign the same.

h. The property must be kept in "your" possession until "we" give "you" written permission to dispose of it.

i. Send to "us," within sixty (60) days after "our" request, information that sets forth to the best of "your" knowledge and belief:
  (1) The time and cause of loss;
  (2) The interest of all "insureds" and all others in the property involved and all liens on the property;
  (3) Other insurance that may cover this loss;
  (4) Changes in title or occupancy of the property during the term of the policy;
  (5) Specifications of damaged buildings and detailed repair estimates;
  (6) The inventory of damaged property described in 10.f. above;
  (7) Receipts for additional living expenses incurred and records that support the fair rental value loss;
  (8) Evidence or affidavit that supports a claim under the Credit Card, Bank Transfer Card, Forgery and Counterfeit Money coverage stating the amount and cause of loss; and
  (9) Signed, sworn proof of loss.

Section I – Property Additional Loss Settlement Condition

A. The following types of property will be settled at actual cash value at the time of the loss, but not exceeding the amount necessary to repair or replace:
  1. Personal property.
  2. "Farm personal property."
  3. Structures that are not buildings.
  4. Coverage E buildings.
  5. Mobile homes.
  6. "Farm structures."

B. Coverage A buildings will be settled at replacement cost without deduction for depreciation, subject to the following:
  1. If the limit of liability for the damaged building is at least eighty percent (80%) of its full replacement cost at the time of the loss, "we" will pay the full cost of repair or replacement of the damaged part without deduction for depreciation, but not more than the smallest of the following amounts:
    (a) The limit of liability that applies to the building;
    (b) The cost to repair or replace the damage on the same premises with material of like kind and quality; or

13

with respect to "your" insured partnership or joint venture.

c. If "you" are a trust, "insured" also means the named trustee and grantor, but only with respect to their liability as a trustee or grantor.

d. If "you" are an organization other than an individual, partnership or joint venture, "insured" also means "your" executive officers and directors, but only with respect to their liability as stockholders.

2. "Insured" also includes any of "your" employees (other than executive officers), but only for acts that:

a. Cause "bodily injury," "property damage" or "personal and advertising injury" to someone other than "you" or a co-employee; and

b. Are within the scope of the employee's employment by "you." The providing of professional health care services or the failure to provide them will not be considered to be within the scope of an employee's employment by "you."

**"Insured location"** means all locations shown in the "Declarations" where "you" maintain a "farm" or "residence premises." This also includes:

1. Locations acquired by "you" during the policy period for "your" use as a "residence premises."

2. "Your" cemetery plots or burial vaults.

3. A location at which "you" temporarily reside but do not own.

4. Vacant land owned by "you" and shown in the "Declarations" or acquired by "you" during the policy period.

**"Livestock"** means cattle, buffalo, horses, llamas, alpacas, mules, swine, donkeys, goats and sheep. "Livestock" does not include race horses.

**"Medical expenses"** mean:

1. Medical, surgical, dental, x-ray.

2. Ambulance and hospital.

3. Professional nursing and funeral services.

4. Pharmaceuticals, orthopedic and prosthetic devices.

5. Eyeglasses and hearing aids.

"Medical expenses" do not include the cost of:

1. Hot tubs, spas or water beds.

2. Exercise equipment, vibrating or heating devices.

3. Membership in health clubs.

4. Psychological services unless they are a result of "bodily injury."

5. Medical reports unless requested by "us."

6. Treatment for addiction, whether in-patient or not.

7. Massage therapy, unless prescribed by a licensed medical doctor.

**"Mobile agricultural machinery and unlicensed equipment"** means mobile devices used in the everyday operation of the "farm" and designed to be used principally off public roads, including:

1. Accessories, whether or not attached.

2. Tools and spare parts that are specifically designed and intended for use in the maintenance and operation of the mobile devices.

3. "Your" unlicensed "farm" truck.

**"Motor vehicle"** means:

1. A motorized land vehicle designed principally for travel on public roads; or

2. A "trailer" being carried on, towed by or hitched to an "auto."

"Motor vehicle" does not include "recreational motor vehicle."

**"Named insured"** means the person(s) or entity listed as the named insured and shown in the "Declarations."

**"Occupying"** means:

1. In;

2. On; or

3. Getting in, on, out or off.

**"Occurrence"** means:

1. Under Section I – Property and Section IV – Inland Marine; any sudden, unexpected and accidental loss caused by direct physical damage to covered property. All such loss arising from a common cause or a common sequence of events shall be considered the result of one "occurrence."

2. Under Section II – Liability and Section V – Umbrella; an unexpected and unintended accident, including continuous or repeated

14

loss. A building under construction is not considered vacant or unoccupied.

2. For any damage caused by a tenant, members of the tenant's household or the tenant's employees.

## Peril 10 – Theft.

This includes attempted theft and loss of property from a known location when it is probable that the property has been stolen. In the event of loss by theft, promptly notify law enforcement. This Peril does not include:

1. Escape, inventory shortage, wrongful conversion or embezzlement.
2. Loss of a precious or semi-precious stone from its setting.
3. Loss caused by theft:
   a. Committed by an "insured" or by any other person temporarily or regularly residing on the "insured location."
   b. In or to a building under construction or of materials and supplies for use in the construction until the building is completed and occupied.
   c. From the part of a "residence premises" rented to others caused by a tenant, members of the tenant's household or the tenant's employees.
4. Loss caused by theft that occurs away from the "residence premises" of:
   a. Property while at any other residence owned, rented to or occupied by an "insured," except while an "insured" is temporarily residing there. Property of a student who is an "insured" is covered while at a residence away from home.
   b. "Watercraft" of all types, including their furnishings, equipment and outboard motors.
   c. "Trailers."

## Peril 11 – Breakage of glass or safety glazing material which is part of the covered building.

This coverage extends to storm doors and storm windows in storage. This Peril does not include loss if the building has been vacant more than sixty (60) consecutive days immediately before the loss.
A building under construction is not considered vacant.

## Peril 12 – Weight of ice, snow or sleet that *** causes damage to a building or property contained in a building.

This Peril does not include loss to an awning, fence, patio, pavement, sidewalk, swimming pool, foundation, retaining wall or footing, bridge, bulkhead, pier, wharf or dock.

## Peril 13 – Volcanic eruption.

Meaning only direct loss to a building or property contained in a building arising out of the eruption of a volcano when the direct loss is caused by:

1. Volcanic blast or airborne shock waves.
2. Ash, dust or particulate matter.
3. Lava flow.

This Peril does not include loss caused by:

1. Earthquake.
2. Land shock waves.
3. Tremors.

One or more volcanic eruptions that occur within a 72-hour period shall be considered as one volcanic eruption.

"We" will pay for the cost of removal of only the ash, dust or particulate matter which has caused direct physical damage to a building or property contained in a building.

## Peril 14 – Accidental discharge or overflow. ***

Accidental discharge or overflow of water or steam from within:

1. A plumbing, heating or air conditioning system.
2. An automatic fire protection sprinkler system.
3. A household appliance.

"We" also pay for tearing out and replacing any *** part of the covered building necessary to repair the system or appliance from which the water or steam escaped.

This Peril does not include loss:

1. To a building caused by continuous or repeated seepage or leakage.
2. On the "residence premises" if the building has been vacant for more than sixty (60) consecutive days immediately before the

15

loss. A building under construction is not considered vacant.

3. To the system or appliance from which the water or steam escaped.
4. Caused by or arising out of freezing.
5. On the "residence premises" caused by accidental discharge or overflow that occurs off the "residence premises."

Under this Peril, a plumbing system or household appliance does not include:
1. Sump, sump pump, its related equipment or any other type system designed to remove subsurface water.
2. A roof drain, gutter, downspout, storm drain or similar fixtures or equipment.

\*\*\*    **Peril 15 – Sudden or accidental tearing apart, cracking, burning or bulging.**

Sudden or accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system or an appliance for heating water.

Under this Peril, "we" do not cover loss caused by or arising out of freezing.

**Peril 16 – Falling objects.**

This Peril does not include loss to:
1. The interior of a building or property contained in the building unless the roof or an exterior wall of the building is first damaged by a falling object.
2. Damage to the falling object itself.

**Peril 17 – Freezing of a plumbing, heating or air conditioning system or a household appliance.**

This Peril does not include loss on the "residence premises" unless "you" have used reasonable care to:
1. Maintain heat in the building; or
2. Shut off the water supply and drain the system and appliances of water.

Under this Peril, a plumbing system or household appliance does not include:
1. Sump, sump pump, its related equipment or any other type system designed to remove subsurface water.

2. A roof drain, gutter, downspout, storm drain or similar fixtures or equipment.

**Peril 18 – Sudden and accidental damage from artificially generated electrical current.**

**Peril 19 – Collision with another object or overturn.**

This Peril does not apply to "livestock." This Peril includes loss of or damage caused by collision or overturn of covered "farm personal property." Collision means accidental contact of the covered property with another vehicle or object.

This Peril does not include loss:
1. To tires or tubes unless the damage coincides with other covered damage to "mobile agricultural machinery and unlicensed equipment."
2. Caused by contact between "mobile agricultural machinery and unlicensed equipment" and implements during towing, hitching or unhitching.
3. Caused by foreign objects taken into any "mobile agricultural machinery and unlicensed equipment."
4. Caused by contact of "farm personal property" with the roadbed or ground.
5. Weight of a load exceeding the registered lifting or supporting capacity of any item of equipment.

**Peril 20 – Electrocution to covered "livestock."**

**Peril 21 – Direct attack to covered "livestock" by dogs or wild animals.**

This Peril applies when the attack causes wounds resulting in death. It does not include attack by dogs owned by an "insured" or any person residing on the "insured location."

**Peril 22 – Accidental shooting to covered "livestock."**

This Peril does not include loss caused by an "insured," an "insured's" employee or a person residing on the "insured location."

16

- **6.01015 Building, and structural Maintenance and repair:**

A. In general, maintenance and minor repair activities do not require a Building Construction and Alteration Permit. Minor repair and maintenance activities shall include all of the following:

1. The intent to preserve the original condition of a building or structure or to return a damaged/deteriorated building or structure or a component thereof to its pre-damaged/deteriorated condition;

3. The replacement of existing materials with materials of the same or similar type, except for roof replacements. Existing wood shingle or wood shake roofs will be replaced with Class A roof coverings. Wood shingles or wood shakes are not allowed.

U.S. Mail: 171 Vista Drive, Star Valley Ranch, Wyoming 83127-5158
(307) 883-TOWN (8696) Facsimile: (307) 883-TFAX (8329)
E-mail: svrtown@silverstar.com
www.starvalleyranchwy.org

17



18

portable fire extinguisher when it has been used to combat a covered fire.

This coverage is in addition to the Coverage C limit of liability.

9. **Grave Markers**. "We" will pay up to $2,500 for a covered loss under Coverage C for grave markers.

This coverage does not increase the Coverage C limit of liability.

10. **Locks**. "We" will pay the reasonable expenses "you" incur to re-key locks on exterior doors of "your" dwelling when the keys to those locks are a part of a covered theft loss.

This coverage is in addition to the Coverages A or C limit of liability.

11. **Clean up and Removal of "Pollutants."** "We" will pay expenses "you" incur to extract "pollutants" from either land or water at the "insured location" only if the release, discharge, distribution, leakage, seepage, migration or escape of the "pollutants" results from a covered Peril that occurs during "your" policy period. Expenses will only be paid if they are reported to "us" within one-hundred and eighty (180) days of the date of "occurrence."

This additional coverage does not include any expenses to test, assess or monitor the existence, effect or concentration of "pollutants." The only testing "we" will pay for are tests that are performed in the course of extraction of the "pollutants" from land or water.

The most "we" will pay is $10,000 during any one policy period regardless of the number of:
a. "Occurrences";
b. "Insured locations"; or
c. Claims made.

This coverage is in addition to the Coverage A limit of liability.

***

19

fifteen (15) days, "you" or "we" may ask a judge of a court having jurisdiction to select an umpire. The appraisers will separately set the value of the property or amount of loss and that value or

amount will be submitted to the umpire. A decision by any two (2) shall set the amount of the loss and will be binding. Each party will:

a.  Pay its chosen appraiser; and

b.  Bear all other appraisal and umpire costs equally.

If there is an appraisal, "we" still reserve "our" right to deny the claim.

2.  **Loss Payment.** Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Covered losses will be payable in accordance with the applicable state statute after we receive your proof of loss. Wyoming: within forty five (45) days 26-15-124 Montana: within thirty (30) days 33-18-232.

20

December 8, 2013

Mountain West Farm Bureau Insurance
931 Boulder Drive
Laramie, WY 82070
Claims Department

Re Policy No. 4H082766

Please be advised that I Hollie Telford as a policy holder under the foregoing homeowners policy am submitting my accommodation request to you in writing. As you know, both occupants of this home are disabled. Under the American with Disabilities Act, title III and under the Federal Housing Act, 42 U. S. C. § 3610 (f) (3) (B) and 24 C. F. R. § 100.204, I am asking MWFBI to make reasonable accommodations in your rules, policies, practices or services WITH RESPECT TO THE TIME PERIOD TO MAKE A PAYOUT FOR REPAIRS TO PLUMBING AND SEWAGE LINES on our residence property from peril #12- weight of snow, sleet or rain which caused our plumbing and septic lines to suddenly disconnect  –  from 45 days as shown in attachment 1 hereto  to immediately  – so that we as disabled and handicapped persons  have an equal opportunity to use and enjoy our dwelling,  rather than be displaced for lack of competent water and waste services.  See *Southeastern Community College v. Davis*, 442 U. S. 397 (1979) (Complainant must show that but for the accommodation he likely would have been denied an equal opportunity to enjoy the "full benefits" of his housing).    I am  presently  shoveling snow from the outside and cooking it on the stove to supply me with water and discharging my waste in poop bags.  It stinks in our residence from the sewer/septic lines having  been breached somewhere below the home.  I have shut off the water from inside the home as a protective measure.  If this accommodation is not granted,  we will be otherwise forced to utilize the loss of use provision in our policy attached hereto as attachment 2.

Please rsvp ASAP.

Hollie  Telford
Policyholder

fifteen (15) days, "you" or "we" may ask a judge of a court having jurisdiction to select an umpire. The appraisers will separately set the value of the property or amount of loss and that value or

amount will be submitted to the umpire. A decision by any two (2) shall set the amount of the loss and will be binding. Each party will:

a.  Pay its chosen appraiser; and
b.  Bear all other appraisal and umpire costs equally.

If there is an appraisal, "we" still reserve "our" right to deny the claim.

2.  **Loss Payment**. Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Covered losses will be payable in accordance with the applicable state statute after we receive your proof of loss. Wyoming: within forty five (45) days 26-15-124 Montana: within thirty (30) days 33-18-232.

# SECTION I - PROPERTY COVERAGES A, B AND C

"We" insure property shown in Section I against sudden and accidental direct physical loss. The Perils and "our" limits of liability for the described property are shown in the "Declarations."

## COVERAGE A – "Your" Dwelling

1. **Covered Property:**
   a. Dwellings:
      (1) Dwellings located on the "residence premises."
      (2) Outdoor equipment used to service the dwelling.
      (3) Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling on the "residence premises."
   b. Other structures:
      (1) Other structures on the "residence premises" separated from the dwelling by a clear space or connected to the dwelling by only a fence, utility line or similar connection.
      (2) "Our" limit of liability for all other structures shall not exceed ten percent (10%) of the amount shown for the Coverage A dwelling. This includes materials and supplies located on such premises for use to construct, alter or repair such other structures. This limit applies per "occurrence" regardless of the number of other structures. Use of this coverage does not reduce the Coverage A limit of liability.
      (3) Any structure separately described or insured in this policy or any other policy shall not be considered an other structure.

2. **Property Not Covered:**
   a. Other structures used in whole or in part for "farming" or "business" purposes.

   b. Land including, but not limited to, subsurface interests, minerals and groundwater.
   c. Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.
   d. Field, corral, pasture or wind or snow fences, even attached to a structure.
   e. Windmills, wind generators, wind chargers and towers.

## COVERAGE B – Loss of Use

No deductible applies to Coverage B.

If a loss covered under Coverages A or C of this policy makes the dwelling in which "you" reside uninhabitable, "we" will pay the resulting loss of use. "Our" limit of liability, per "occurrence," for Coverage B is the total limit for the coverages described below:

1. **Additional Living Expense.** Any necessary increase in living expenses incurred by "you" so that "your" family can maintain its normal standard of living. Payment shall be for the shortest time required to repair or replace the premises or if "you" permanently relocate, the shortest time required for "your" family to settle elsewhere. This coverage is limited to twelve (12) months from the date of loss.

2. **Fair Rental Value.** Payment shall be for the shortest time required to repair or replace the part of the premises rented or held for rental. This coverage is limited to twelve (12) months from the date of loss. Fair rental value shall not include any expenses that do not continue while part of the dwelling premises rented or held for rental is uninhabitable.

3. **Prohibited Use.** If a civil authority prohibits "you" from use of the "residence premises" as a result of direct damage to neighboring premises by a covered Peril in this policy, "we" cover any resulting additional living expenses or fair rental

21

4. Defendant denies that it ever received any notice of claim describing a loss to property insured under the terms, conditions and limitations of the Policy. Defendant denies that Holli Telford submitted a signed, sworn proof of loss or that she has complied with any of the terms, conditions or limitations of the Policy in connection with any alleged loss or claim. Defendant is without information sufficient to form a belief as to the truth of the remaining matters alleged in paragraph 3 of Plaintiffs' Complaint and therefore denies the same.

5. Defendant is without information sufficient to form a belief as to the truth of the matters alleged in paragraph 4 of Plaintiffs' Complaint and therefore denies the same.

6. Defendant is without information sufficient to form a belief as to the truth of the matters alleged in paragraph 5 of Plaintiffs' Complaint and therefore denies the same.

7. Defendant admits that the Policy was cancelled effective February 9, 2014 due to Plaintiffs' failure to pay premiums in accordance with the terms, conditions and limitations of the Policy. Defendant denies the remaining matters alleged in paragraph 6 of Plaintiffs' Complaint.

8. Defendant denies the matters alleged in paragraph 7 of Plaintiffs' Complaint.

9. As a further affirmative defense, Defendant states and alleges that Plaintiffs' Complaint fails to state a cause of action upon which relief may be granted.

10. As a further affirmative defense, Defendant states and alleges that Plaintiffs' complaint is barred by Plaintiffs' failure to satisfy conditions precedent under the terms, conditions and limitations of the Policy, including but not limited to the requirement to give prompt notice of any alleged loss to covered property, the requirement to protect the property from additional loss, the requirement to show the damaged property to MWFB, the requirement to provide records and documents to support the claim and the requirement to cooperate with MWFB is the investigation of any claim.

11. As a further affirmative defense, Defendant states and alleges that Plaintiffs' Complaint is barred in whole or in part by the statute of limitations.

12. As a further affirmative defense, Defendant states and alleges that Plaintiffs' Complaint is barred by the doctrine of laches.

13. As a further affirmative defense, Defendant states and alleges that Plaintiffs' have failed to make proper service of process.

14. As a further affirmative defense, Defendant states and alleges that Plaintiffs' have failed to perfect service of process, as required by W.S. § 26-3-122.

22

# Urgent wrongful termination notice

### hollie telford

Sun 2/23/2014 11 17 AM

To lbonnecaze@mwfbi.com <lbonnecaze@mwfbi.com>:

📎 1 attachment (739 KB)

policy premium, pmts and balance due.pdf;

Lea:  Mountain West  illegally terminated my home owners policy on February 9, 2014.  I am demanding that it be reinstated without fees or lapses in coverage.  Attached is: (1)  the policy declarations page showing the policy premium,  (2) all of the payments Mountain West has negotiated against my bank account;  (3) calculations showing that I have paid Mountain West $316.41 in premium payments to date,  (4)  calculations showing that my premium payments have been paid through the 7th month of the policy period to wit: March 9, 2014 given my payments to date have paid 60% of the policy premium;  (5) and showing the balance due on my policy as of March 9, 2014 will be $212.29.

Accordingly it is demanded that this policy be immediately reinstated and properly show that coverage was never lapsed.  I have previously left messages on your phone service but for some reason you either dont respond to my messages or they never reach you.  This email therefore constitutes my demand notice to you.

23



THE STATE          OF WYOMING

# *Insurance Department*

106 E. 6th Street · Cheyenne, Wyoming 82002

Administration (307) 777-7401 · Facsimile (307) 777-5895 · Agent Licensing (307) 777-7319 · http://doi.wyo.gov

---

## FACSIMILE TRANSMITTAL SHEET

| TO:<br>Holli Telford | FROM:<br>Heather Canarecci |
|---|---|
| COMPANY: | DATE:<br>5/9/2016 |
| FAX NUMBER:<br>(307) 212-6888 | TOTAL NO. OF PAGES INCLUDING COVER:<br>13 |
| PHONE NUMBER:<br>(801) 791-2242 | SENDER'S REFERENCE NUMBER:<br>n/a |
| RE:<br>Telford v. MWFB Docket No. 33719 | YOUR REFERENCE NUMBER: |

☐ URGENT    √ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

NOTES/COMMENTS:

As requested, please find attached the documents we have relating to Telford v. MWFB.

THE STATE  OF WYOMING          Matthew H. Mead
                                                          Governor

*Insurance Department*                                 Tom Glause
106 East 6th Avenue ♦ Cheyenne, Wyoming 82002          Commissioner

April 7, 2016

CERTIFIED MAIL

Mountain West Farm Bureau Mutual Insurance Company, Inc.
P O Box 1348
Laramie, WY 82073

     Re:   Service of Process

Dear Sir or Madam:

    I am enclosing herewith a Summons and Complaint for Civil Action No. 33719 filed in the Second Judicial Court, County of Albany, and served by UPS on the Insurance Commissioner for the State of Wyoming on April 7, 2016, acting as Agent for Service of Process for the insurance company in the matter of Marti Telford, Plaintiff vs. Mountain West Farm Bureau Mutual Insurance Company, Inc., Defendant.

                   Sincerely,

                   Heather M. Canarecci
                   Legal Assistant

/hmc

Enclosure

**Invoice ID:** 627140

**SSN:**

## Payment Information:

**Date Received:** 04-06-2016

**Amount Received:** $10.00

**Payment Method:** Check

**Payment Reference ID:** 1386

---

7012 3460 0000 7416 5882

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

PS Form 3800, August 2006                    See Reverse for Instructions

Postmark Here

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

**1. Article Addressed to:**

Mountain West Farm Bureau Mutual
P.O. Box 1348
Laramie, WY 82073

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   Jolene Lone

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

**3. Service Type**
☒ Certified Mail®    ☐ Priority Mail Express™
☐ Registered         ☒ Return Receipt for Merchandise
☐ Insured Mail       ☐ Collect on Delivery

**4. Restricted Delivery? (Extra Fee)**    ☐ Yes

**2. Article Number**
(Transfer from service label)    7012 3460 0000 7416 5882

PS Form 3811, July 2013            Domestic Return Receipt

UPS 4616
no signature
required

·l    ·

STATE OF WYOMING  )                        IN THE SECOND JUDICIAL DISTRICT
                    : ss                  COURT OF WYOMING, ~~FREMONT~~ COUNTY
COUNTY OF FREMONT )              WY. INEU   ·E   .T.    Albany

                                     .J15 APR   9   A7 11 A3
MARTI TELFORD          )                                          33719
                                         RECL  . .
      Plaintiff        )       ·
                                     **SUMMONS**
         vs.           )

MOUNTAIN WEST FARM     )
BUREAU MUTUAL
INSURANCE COMPANY      )

      Defendants       )

To the above named Defendant:

MOUNTAIN WEST FARM BUREAU MUTUAL INSURANCE COMPANY
502  South 3rd St.
Laramie WY 82070

SERVICE MADE UPON WYOMING Insurance Commissioner Tom GLAUSE * 1

YOU ARE HEREBY SUMMONED and required to file with the Clerk and serve upon
the Plaintiff or Plaintiffs attorney if she has one, an Answer to the Complaint which is herewith
served upon you, within 30 days after service of this Summons upon you, exclusive of the day
of service.

If you fail to do so,   judgment by default will be taken against you for the relief
demanded in the Complaint.

Dated February 17, 2016.

(Seal of District Court)

Clerk of Court

By: M Jrabuyl
        Deputy Clerk

Plaintiff: MARTI TELFORD
        312 MADISON AVE.
        SINCLAIR, WY 82334
        307-352-9577

1. ADDRESS FOR TON GLAUSE:  Wyoming Insurance Dept.
                            106 E. 18th Ave.
                            Cheyenne, WY 82002

IN THE SECOND JUDICIAL DISTRICT
COURT OF WYOMING, ALBANY COUNTY

| | |
|---|---|
| MARTI TELFORD<br>HOLLI TELFORD | ) |
| Plaintiff | ) |
| | ) Civil No. 337|9 |
| vs. | ) |
| | COMPLAINT |
| MOUNTAIN WEST FARM | ) |
| BUREAU MUTUAL | |
| INSURANCE COMPANY | ) |
| Defendants | ) |

FILED
IN DISTRICT COURT
FEB 17 2016
CLERK OF DISTRICT COURT
LARAMIE WYOMING

COMES NOW MARTI TELFORD aka MARTI LUNDAHL and HOLLI TELFORD file this complaint against Mountain West Farm Bureau Mutual Insurance Company, a resident doing it's principal business in this county, for Wyoming Fair Housing Act violations, Breach of an insurance contract, Breach of the implied covenant of good faith and fair dealing, and emotional distress damages.

## PREFACE TO THE COMPLAINT

The State of Wyoming just passed the Wyoming Fair Housing Act into law on July 1, 2015. The Act had never been interpreted by a court of law. Also passed as part of the state act was a law that required that the state adopt federal decisions as applied to the federal Fair Housing Act in re WY statute 40-25-114: Duties and powers of enforcing authority.

... substantive rules adopted by the enforcing authority shall impose obligations, rights and remedies that are the same as are provided in federal fair housing regulations.

**Prohibited conduct under the Fair Housing regulations includes "[r]efusing to provide**

24

George E. Powers, Jr. 5-2062
Leigh Anne Manlove, 6-3441
Sundahl, Powers, Kapp & Martin, LLC
1725 Carey Avenue
P.O. Box 328
Cheyenne, Wyoming 82003
(307) 632-6421 telephone
*Attorney for Defendant MWFB*

STATE OF WYOMING        )
                                   )ss.

COUNTY OF ALBANY        )

IN THE DISTRICT COURT

SECOND JUDICIAL DISTRICT

MARTI TELFORD, HOLLI TELFORD,    )
                                           )

        Plaintiffs,              )

                                           )

vs.                                   )        Civil No. CV-33719

                                           )

MOUNTAIN WEST FARM BUREAU MUTUAL  )
INSURANCE COMPANY, A Wyoming     )
Corporation,                       )

                                           )

        Defendant.            )

## NOTICE OF ISSUANCE OF SUBPOENA DUCES TECUM

**COMES NOW** the Defendant, Mountain West Farm Bureau Mutual Insurance Company,

and hereby give notice that on August 10, 2016, a Subpoena Duces Tecum was issued by the

undersigned counsel to Gregg Wilkes, Town Administrator, Town of Star Valley Ranch,

Wyoming. A true and accurate copy of said Subpoena Duces Tecum is attached hereto and

incorporated herein by this reference.

        **DATED** this 10th day of August 2016.

George E. Powers, Jr. 5-2062
Leigh Anne Manlove, 6-3441
Sundahl, Powers, Kapp & Martin, L.L.C.
1725 Carey Avenue
P.O. Box 328
Cheyenne, WY 82003-0328
(307) 632-6421
*Attorney for Mountain West Farm Bureau
Mutual Insurance Company*

1

## CERTIFICATE OF SERVICE

I certify the foregoing pleading was served on this 10th day of August 2016, and that copies were served as follows:

Marti Telford  
935 Wilderness Trail  
Green River, WY 82935

[ X ] U.S. Mail  
[ ] Fed Ex  
[ ] Fax  
[ ] Hand Delivered  
[ ] E-mailed

Holli Telford  
935 Wilderness Trail  
Green River, WY 82935  
hollitelford@gmail.com

[ X ] U.S. Mail  
[ ] Fed Ex  
[ ] Fax  
[ ] Hand Delivered  
[ X ] E-mailed

Leigh Anne Manlove

2

George E. Powers, Jr. 5-2062
Leigh Anne Manlove, 6-3441
Sundahl, Powers, Kapp & Martin, L.L.C.
P.O. Box 328
Cheyenne, WY 82003-0328
(307) 632-6421
*Attorney for Defendant Mountain West Farm Bureau*

STATE OF WYOMING   )
          ) SS.
COUNTY OF ALBANY   )

IN THE DISTRICT COURT

SECOND JUDICIAL DISTRICT

MARTI TELFORD, HOLLI TELFORD,  )
                )
                )
                )
   Plaintiffs,       )
VS.             )  Civil No. CV-33719
                )
MOUNTAIN WEST FARM BUREAU MUTUAL )
INSURANCE COMPANY, A Wyoming Corporation, )
                )
                )
   Defendants      )

## SUBPOENA DUCES TECUM

To: Town Administrator, Gregg Wilkes
   Town of Star Valley Ranch
   171 Vista Drive, HC 62 Box 7007t
   Star Valley Ranch, WY 83127

   **YOU ARE HEREBY COMMANDED** to produce, and permit inspection and copying of the documents listed in Exhibit 'A' attached to this subpoena which are in your possession, or to which you have access. Said documents should be produced on or before September 4, 2016.

   This subpoena may be satisfied by sending copies of the documents before, to George E. Powers, Jr., or Leigh Anne Manlove, Sundahl, Powers, Kapp & Martin, 1725 Carey Avenue, Cheyenne, Wyoming. Sundahl, Powers, Kapp & Martin will promptly remit payment for the reasonable cost of retrieving and making the copies.

   In accordance with Rules 45(c)(d) and (e) of the Wyoming Rules of Civil Procedure, a person receiving a subpoena is entitled to the protection, and is subjected to the duties set forth in the attached "general information regarding subpoena."

   **YOU ARE FURTHER DIRECTED** to hold and not destroy the original of the documents requested pending further order of the court.

_____   _____   *8.10.16*
Issuing officer's signature and title (Attorney for Mountain West Farm Bureau)  Date

**George E. Powers, Jr.**
**Leigh Anne Manlove**
**Sundahl, Powers, Kapp & Martin**
**P.O. Box 328**
**Cheyenne, WY 82003-0328**
**307-632-6421**
Issuing officer's name, address and telephone number

(See Rule 45, Wyoming Rules of Civil Procedure, Parts c, d, and e on page 3).

1

**PROOF OF SERVICE**

| | |
|---|---|
| Date Served | Place |

| | |
|---|---|
| Served on (Print Name) | Manner of Service |

| | |
|---|---|
| Served by (Print Name) | Title |

Declaration of Service

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____.

_____
Signature of Server

_____
Address of Server

(c) *Protection of persons subject to subpoenas.*

(1)      A party or any attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)      (A)      A persons commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)      Subject to subdivision (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the a party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)      (A)      On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it:

(i)      Fails to allow reasonable time for compliance;

(ii)      Requires, in the case of a deposition or production prior to hearing or trial, a person to travel outside that person's county or residence or employment or a county where that person regularly transacts business in person; or

(iii)      Requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv)      Subjects a person to undue burden.

(B)      If a subpoena:

(i)      Requires disclosure of a trade secret or other confidential research, development, or commercial information; or

(ii)      Requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party; or

(iii)      Requires a person who is not a party or an officer of a party to incur substantial expense to travel to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)      *Duties in response to subpoena.*

(1)      A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)      When information or material subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(e)      *Contempt.* - Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena was issued. Adequate causes for failure to obey include lack of personal service upon the person subpoenaed, and when a subpoena purports to require a person to attend a deposition or produce prior to hearing or trial at a place not within the limits provided by clause (ii) of subdivision (c)(3)(A).

(Amended October 21, 1970, effective February 11, 1971; amended November 6, 1980, effective January 28, 1981.)

## EXHIBIT A

1. All town records for the property at located at 322 Vista East Drive, Star Valley Ranch, Wyoming, on that tract of land described as Lot 132, Star Valley Ranch, Plat 6, in Lincoln County, Wyoming; including but not limited to: building permits, assessments, inspection records, water billing records, road division records, dog/cat registration(s), county sheriff records, emergency operator records, first responder (police, fire, sheriff) records, tax records, voter registration, vehicle registration, town permits, etc.

2. All town records related to Holli Telford (nee Lundahl) from June, 2013, to the present, including but not limited to: notes, voicemail messages, email messages, correspondence, records, tapes, recordings, statements, photographs and documents.

3. All town records related to Marti Telford (nee Lundahl) from June, 2013, to the present, including but not limited to: notes, voicemail messages, email messages, correspondence, records, tapes, recordings, statements, photographs and documents.

25

# realtor.com®

Home For Sale – Active

## $44,900
## 111 Fir Pl

Star Valley Ranch, WY 83127      ⊙ Calculate Commute Time

**0.5** acres lot



Listing Agent
**Paul Callens**

Mobile: (307) 413-6968
Email Agent
View Agent's Website ☐
Agent's Other Listings



Listing Broker
**Jackson Hole Real Estate Associates**
Local Ownership |
Worldwide Reach

Phone: (855) 269-0321
Email Broker
View Broker's Website ☐
Broker's Other Listings



Presented by **Paul Callens**
Brokered by **Jackson Hole Real Estate Associates, Llc**

# Property Details

### Open House

None at this time

Request a Private Showing

### Overview

26

# realtor.com®

Home For Sale

## $335,000
## 186 Vista East Dr

Star Valley Ranch, WY 83127    ⊙ Calculate Commute Time

**2** beds · **2** full baths · **2,024** sq ft · **0.54** acres lot







Presented by **Tiphany Gayhart**
Brokered by **Real Estate Of Star Valley**

# Property Details

## Open House

None at this time

Request a Private Showing

## Overview

27

# realtor.com®



Home For Sale – Active

## $599,000
## 279 Vista East Dr

Star Valley Ranch, WY 83127     ⊙ Calculate Commute Time






Presented by **Val Pendleton**
Brokered by **Coldwell Banker Country Estates**

## Property Details

### Open House

None at this time

Request a Private Showing

### Overview

28

 Gmail           holli lundahl <hollilundahl@gmail.com>

## FTCA ADMINISTRATIVE CLAIM

1 message

holli lundahl <hollilundahl@gmail.com>      Mon, Jul 21, 2014 at 3:36 PM
To: Tafoya, Eva K  <Eva.K.Tafoya@hud.gov>

Eva Tafoya
Program Analyst
Housing and Urban Development
1670 Broadway
Denver, CO 80202
303-672-5192

    Please find attached a form 95 for FTCA claims re HUD.

🗒 **Form 95**

29

 Gmail                                                    holli lundahl <hollilundahl@gmail.com>

## re objection to production of SDT - **Form 95**

holli lundahl <hollilundahl@gmail.com>                                    Sun, Nov 16, 2014 at 8:44 PM
To: Susan.e.aukema@usps.gov

📄 letter to paralegal at law dept for post office attached Form 95.pdf
    37K

30

AMENDED

FORM APPROVED
OMB NO.
1105-0008

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. |
|---|---|

**1. Submit To Appropriate Federal Agency:**

Civil Torts Adjustors
US Dept of Justice
Civil Division, Torts Branch
P.O. Box 888
Benjamin Franklin Station, Wash. D.C. 20044

**2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code)** Steve Fritts, Hollie Telford, Lisa Nelson
Shanandoah Trust
229 N. Pine Street
Gordon, NE 69343

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT multiple dates -last date Dec 3 2014 | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

**8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)**

Claimants Hollie, Steve and Lisa Nelson hereby sue the United States for the tortious actions of 2 postal service employees, Susan Aukema and Pamela Gee. Claimants tort claims as to PAMELA GEE include nusiance and trespass as to Claimant's mail and associated mental distress, Claimant Hollie Telford's claims as to PAMELA GEE also include ongoing torts of false imprisonment, false arrest, abuse of office, intentional infliction of emotional distress on multiple occasions through todays date.

**9.                                                   PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

see box 8 and second page.

**10.                                               PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Claimant's personal injury claims are also set forth in box 8 supra

**11                                                       WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Steve Fritts | 229 N. Pine St. Gordon, NE 69343 |
| Brenda Burton | same |
| Lisa Nelson | same |
| hollie Telford | same |

**12. (See instructions on reverse.)                    AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| 1 million | 4 million | | 5 million |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of person signing form 402-302-1766 | 14. DATE OF SIGNATURE 12/19/2014 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109                                    NSN 7540-00-634-4046                    STANDARD FORM 95
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes  If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☐ No

NO

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☐ No   17. If deductible, state amount.

NO

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

N/A

19. Do you carry public liability and property damage insurance?  ☐ Yes  If yes, give name and address of insurance carrier (Number, Street. City, State, and Zip Code).  ☐ No

N/A

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT. HIS DULY AUTHORIZED AGENT. OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital. or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.
C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

31

<table>
<tr><td colspan="2"><strong>CLAIM FOR DAMAGE, INJURY, OR DEATH</strong></td><td><strong>INSTRUCTIONS:</strong> Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.</td><td><strong>FORM APPROVED</strong><br>OMB NO.<br>1105-0008</td></tr>
</table>

| 1. Submit To Appropriate Federal Agency:<br><br>Civil Torts Adjustors<br>US Dept of Justice<br>Civil Division. Torts Branch<br>P.O. Box 888<br>Benjamin Franklin Station, Wash. D.C. 20044 | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code)  Steven Fritts, Hollie Telford, Marti Lundahl<br>Shanandoah Trust<br>229 N. Pine Street.<br>Gordon, NE 69343 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT<br>thanksgiving 2013 | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Claimants Holli and Marti are protected disabled persons under the FHA, ADA and section 504 of the RA. Shanandoah Trust is a Trust developed for the benefit of disabled beneficiaries and the owner of a certain home located at 322 Vista East, Star Valley Ranch, WY 83127. The home was insured by Mountain West Farm Bureau Insurance. See second page for additional explanation. >>>>

| 9 | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See Instructions on reverse side.)

see box 8 and second page.

| 10 | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

personal injury to Hollie Telford- rupture of t-12-L1 disc. personal injury to Marti Lundahl agravation of stage IIIB-IV invasive carcinoma and brain anuerysm from emotional distress in June 2015.

| 11 | WITNESSES | |
|---|---|---|
| **NAME** | | ADDRESS (Number, Street, City, State, and Zip Code) |
| Steve Fritts<br>Brenda Burton<br>Lisa Nelson | | 229 N. Pine St. Gordon, NE 69343<br>same<br>same |

| 12 (See instructions on reverse.) | | AMOUNT OF CLAIM (in dollars) | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE<br>2 million | 12b. PERSONAL INJURY<br>3 million | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.)<br>5 million |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of person signing form<br>402-302-1766 | 14. DATE OF SIGNATURE<br>12/26/2014 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both (See 18 U.S.C. 287, 1001.) |

NSN 7540-00-634-4046                    STANDARD FORM 95<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☒Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☐ No

**Mountain West Farm Bureau Insurance**
**Laramie, Wyoming**

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☒Yes   ☐No   | 17. If deductible, state amount.

yes

500

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

None. MWFBI has violated the FHA and ADA in unilaterally terminating our insurance because we are disabled and exist off of ssi income and therefore cannot fund litigation against them.

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

MWFBI is our property damage insurance

This action may also be pursued under the westfall act

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U S C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached
  A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq , 28 U S C. 2671 et seq , 28 C.F.R. Part 14.

B. *Principal Purpose.* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U S C 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

In 2013, while residing at our Wyoming home, a huge snow storm hit our property. See exhibit "1" attached. 5 foot sheets of snow and ice developed on our roof weighing down our 30' by 45' lofted cabin built on inclined ground and supported by 4 stilts in the forward aft position. The snow continued for another week from the date of the picture attached hereto. The weight of the snow and ice caused our home to sink and dislodge forward. The fireplace kept our home from crashing forward onto the ground. When our home dislodged it abruptly disconnected all of our plumbing and sewage lines to the home. Sewage and water backed into the home. Holli shut off the water lines to prevent further damage. Marti and Holli survive off the ssi income.

Claimaints herein had insurance through Mountain West Farm Bureau Insurance Company and made a claim in late November and early December of 2013. MWFBI had 45 days under Wyoming law to fund the repairs. MWFBI failed to both fund these repairs and to accommodate HOLLI's request of waiver of the 45 day period for funding. HOLLI contacted Kinara Flagg of the DOJ civil rights sector and Eva Tafoya of HUD in Denver to complain about MWFBI's failure to fund the repairs on this disabled household's residence and to accommodate those repairs in a timely manner. Trustees of the trust also attempted to reach these federal officers to buttress HOLLI's complaints. While Flagg and Tafoya promised HOLLI that they were would enforce the FHA and ADA regulations against insurance company, and compel immediate repairs to the home, these federal officers failed to affirmatively take any action required under the Code of Federal regulations to advance the objectives of the FHA and ADA and thereby make HOLLI and MARTI's, protected diabled persons, home avaialable to them. In fact, as set forth below, MWFBI, Flagg and Tafoya maliciously caused HOLLI and MARTI to be subjected to unsafe and unsanitary living conditions to their injuries until they were forced to remove from their dwelling to avoid further medical harm.

Specifically, from December of 2013 to April of 2014 after the snow/ice peril occurred, HOLLI (having a history of back surgeries) shoveled snow from the outside into the residence and cooked the snow on her stove to provide water for the residence. HOLLI was injured during these activities. Sewage fumes permeate the home and it is likely that black mold and fungi has developed to the unaccessible portion to the home where the broken sewer lines are situated. MWFBI, FLAGG and TAFOYA were made aware of these unsafe and unsanitary conditions within 30 days of their accrual and of HOLLI's accommodation requests. MARTI has stage IIIB-IV invasive carcinoma. The sewage orders have severely compromise her health. MWFBI has refused to give either MARTI or HOLLI funds to relocate to a new premise until the repairs could be made to their dwelling. In fact, nearly two months after the peril occurred. MWFBI claimed to have increased Claimaints policy mid period and unilaterally terminated claimants homeowners insurance (which had been advanced paid) based directly on MARTI and HOLLI's disability statuses and increased risk to policy coverages.

The knowing subjection of HOLLI and MARTI to deplorable living conditions in violation of the FHA and ADA and failure of FLAGG in particular to enforce the CFR housing regulations against MWFBI has now subjected the United States to claims of intentional/negligent infliction of emotional and mental distress and to tortious interference with claimant's quiet enjoyment of their property. IN addition, the trustees have also taken efforts to protect the civil rights of HOLLI and MARTI to no avail, and seek a claim of nuisance against the USA for failure to enforce FHA regulations against MWFBI.



32

# U.S. Postal Service™ Signature Confirmation™ Receipt

Postage and Signature Confirmation fees must be paid before mailing.

**Article Sent.To: (To be completed by mailer)**

SIGNATURE CONFIRMATION NUMBER. 2312 3170 0000 1412 0232

Brent Phipps - Civil Torts Adjuster
U.S. Dept of Justice
Civil Division, Torts Branch
P. O. Box 888
Benjamin Franklin Station
Washington D.C.
20044

Postmark Here 2015
USPS

**POSTAL CUSTOMER:**
Keep this receipt. For Inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

**CHECK ONE (POSTAL USE ONLY)**
☐ Priority Mail™ Service
☐ First-Class Mail® parcel
☐ Package Services parcel

**PS Form 153, January 2005**         **(See Reverse)**

English      Customer Service      USPS Mobile                          Register / Sign In



# USPS Tracking™



Customer Service ›
Have questions? We're here to help.

Tracking Number: 23123170000014120232

Updated Delivery Day: Tuesday, January 6, 2015
Signed for By: J BRANCH // WASHINGTON, DC 20044 // 10:01 am

## Product & Tracking Information

### Available Actions

Postal Product:
Priority Mail 2-Day™

Features:
Signature Confirmation™

Up to $50 insurance included
Restrictions Apply

Proof of Delivery

Text Updates

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **January 6, 2015 , 10:01 am** | Delivered | **WASHINGTON, DC 20044** |

Email Updates

Your item was delivered at 10:01 am on January 6, 2015 in WASHINGTON, DC 20044. The item was a gift for your information.

| January 6, 2015 , 8:56 am | Available for Pickup | WASHINGTON, DC 20044 |
|---|---|---|
| January 6, 2015 , 8:53 am | Arrived at Post Office | WASHINGTON, DC 20044 |
| January 5, 2015 , 6:59 pm | Departed USPS Facility | SALT LAKE CITY, UT 84199 |
| January 4, 2015 , 1:10 am | Arrived at USPS Origin Facility | SALT LAKE CITY, UT 84199 |
| January 3, 2015 , 8:54 pm | Departed USPS Facility | ROCK SPRINGS, WY 82901 |
| January 3, 2015 , 4:40 pm | Arrived at USPS Origin Facility | ROCK SPRINGS, WY 82901 |
| January 3, 2015 , 9:59 am | Acceptance | ROCK SPRINGS, WY 82901 |

## Track Another Package

Tracking (or receipt) number

Track It

JS 44 (Rev 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
STEVEN FRITTS and HOLLIE TELFORD

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff    SHERIDAN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    DOUGLAS COUNTY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
STEVE FRITT, Hollie Telford 402-302-1766
229 N. PINE STREET
GORDON, NE 69343

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☒ U.S. Government
Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability ☐ 368 Asbestos Personal | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 460 Deportation ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine ☐ 345 Marine Product Liability | Injury Product Liability | **LABOR** | ☐ 840 Trademark **SOCIAL SECURITY** | Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Property Damage ☐ 385 Property Damage | ☐ 740 Railway Labor Act ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters ☐ 895 Freedom of Information |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | Leave Act ☐ 790 Other Labor Litigation | | Act ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff | Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | **XX FEDERAL** |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty **Other:** | **IMMIGRATION** ☐ 462 Naturalization Application | | **TORTS CLAIMS ACT** |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P    **DEMAND $**    CHECK YES only if demanded in complaint
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE    RICHARD KOPF    DOCKET NUMBER    8:16-CV-368

DATE 9-4-2016    SIGNATURE OF ATTORNEY OF RECORD   Steve Fritts

## FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

This envelope is made from post-consumer waste. Please recycle again.



U.S. POSTAGE
PAID
SANTA CLARA, CA
95054
SEP 07, 16
AMOUNT
**$22.95**
R2304H108487-04

1037 68508

# PRIORITY
# ★ MAIL ★
# EXPRESS

**OUR FASTEST SERVICE IN THE**



**CEIVED**

SEP 0 9 2016

CLERK
U.S. DISTRICT COURT
LINCOLN

**WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.**



EP13F July 2013   OD: 12.5 x 9.5



P S 1 0 0 0 1 0 0 0 0 0 6

**ORDER FREE SUPPLIES ONLINE**



CUSTOMER USE ONLY
FROM: (PLEASE PRINT)   PHONE (  )

Holli Telford
Mail c/o Launche
935 Wilderness Trail
Grace River WY 8293

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)
☐ SIGNATURE REQUIRED

☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
☐ 10:30 AM Delivery Required (additional fee, where available)

TO: (PLEASE PRINT)   PHONE (  )

Robert Denny Federal Court
100 Centennial Mall North
Room 593  Lincoln, NE
69508

● For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
● $100.00 insurance included.

EL 775024360US

**LING LABEL HERE**



UNITED STATES
POSTAL SERVICE

**PRIORITY
★ MAIL ★
EXPRESS™**

ORIGIN (POSTAL SERVICE USE ONLY)
☐ 1-Day   ☐ 2-Day   ☐ Military   ☐ DPO
PO ZIP Code   Scheduled Delivery Date   Postage
95054   1-7-16   22.95

Date Accepted (MM/DD/YY)   Scheduled Delivery Time
1-7-16   ☐ 10:30 AM  ☐ 3:00 PM
☐ 12 NOON

Time Accepted   ☐ AM  ☐ PM
Weight   ☐ Flat Rate   Acceptance Employee Initials

DELIVERY (POSTAL SERVICE USE ONLY)
Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature
Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature

LABEL 11-B, SEPTEMBER 2015   PSN 7690-02-000-9996   3-ADDRESSEE COPY



UNITED STATES
POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuses may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; July 2013.